# In the United States Court of Federal Claims

No. 12-384L

(Filed: March 6, 2015)

|  |  |
|---|---|
| RICHARD LEWIS KATZIN, et al., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| UNITED STATES, | ) |
| | ) |
| Defendant. | ) |
| | ) |

Takings case; alleged interference with, and impairment of marketability of, property; motion to strike; RCFC 56(c)(4); statute of limitations; 28 U.S.C. § 2501; laches; disputed issues of material fact barring summary judgment

Roberto E. Berríos Falcón, San Juan, Puerto Rico, for plaintiffs.  With him on the briefs and at the hearing were Nancie G. Marzulla and Roger J. Marzulla, Marzulla Law, LLC, Washington, D.C.

Emily M. Meeker, Natural Resources Section, Environment and Natural Resources Division, United States Department of Justice, Washington, D.C., for defendant.  At the hearing were William Shapiro, Natural Resources Section, Environment and Natural Resources Division, United States Department of Justice, Sacramento, California, and Cullen S. Shearburn, Natural Resources Section, Environment and Natural Resources Division, United States Department of Justice, Washington, D.C.  With Ms. Meeker and Mr. Shearburn on the briefs were John C. Cruden, Assistant Attorney General, and Sam Hirsch, Acting Assistant Attorney General, Environment and Natural Resources Division, United States Department of Justice, Washington, D.C.

## OPINION AND ORDER

This takings case concerns property located on the Southeast quadrant of Culebra Island, Puerto Rico ("Culebra" or "the Island"), and turns in large part on events and handwritten records spanning the 19th and 20th centuries.  The subject property includes two disputed areas: (1) a 2.25-acre plot of land, which the government maintains was purchased by the United States Navy ("Navy") as a site for a gun mount in 1903; and (2) a peninsular parcel of land identified as Buena Vista ("Buena Vista" or "Buena Vista Peninsula") with an approximate area of 10.01 acres.[1]  Tracing title back to an 1887 land survey of the Island while Culebra was a possession of Spain, the plaintiffs (collectively, the "Katzins") claim ownership over the subject property.[2]

---

[1] The Buena Vista Peninsula is also known as Punta Almodóvar.  *See* Am. Compl. ¶ 59.

[2] There are four plaintiffs in this lawsuit: (1) Richard Lewis Katzin; (2) Mary Beth Katzin Simon; (3) Annette Katzin; and (4) Rosemarie Kjeldsen.  Am. Compl. ¶¶ 1-4.

In 2006, the Katzins entered into a contract to sell a parcel that included the segments at issue to prospective purchasers, but those contractual purchasers rescinded the agreement after being informed by a government employee that ownership of the gun mount site was vested in the United States.  According to the government, the United States has publically claimed ownership of the 2.25-acre gun mount site and the Buena Vista Peninsula for decades.  On June 15, 2012, the Katzins filed suit in this court alleging that the actions of United States amounted to an interference with their property rights and effected a taking in contravention of the Fifth Amendment.  The government has moved to dismiss the case for lack of subject matter jurisdiction under Rule 12(b)(1) of the Rules of the Court of Federal Claims ("RCFC"), or alternatively, the government asks the court for summary judgment pursuant to RCFC 56.  United States' Mot. to Dismiss for Lack of Subject Matter Jurisdiction or, in the Alternative, for Summary Judgment ("Def.'s Mot."), ECF No. 48.   Also before the court is the government's motion to strike the declaration of the Katzins' land title expert, Dennis Martinez, as well as a title report from Armar Title Services, Inc. ("Armar title report").  United States' Mot. to Strike the Declaration of Dennis Martinez and the Title Report of Armar Title Services, Inc. (Def.'s Mot. to Strike"), ECF No. 53.

## BACKGROUND[3]

### A.  History of Ownership Interests on Culebra Island

Culebra, an archipelago of islands, is located approximately seventeen miles east of Puerto Rico and twelve miles west of St. Thomas.  The large island and the smaller attendant islands encompass over 7,000 acres and support diverse habitats for a variety of tropical flora and fauna.  *See* Pls.' Opp'n to the Government's Mot. to Dismiss or, in the Alternative, for Summary Judgment ("Pls.' Opp'n") at 7-9, ECF No. 49.  It is also the site of a 3,709-acre Wildlife Refuge and Nature Reserve, which protects mangroves and nesting colonies of sea birds and sea turtles.  *Id.* at 7.  A general map of Culebra Island and the archipelago is shown below:

---

[3]The recitation of background information does not constitute findings of fact and is provided solely to establish a context for deciding the pending motions.



Def.'s App. Ex. D, Attach. 3.[4]

The Katzins allege ownership of a 65.5-acre area located in the Frailes Ward region of the Island, which includes the Buena Vista Peninsula and perhaps the alleged gun mount site, although the location of the gun mount site is in dispute. *See* Pls.' Opp'n at 8-9, 24-30. The Katzins trace their ownership via a chain of title in the subject property dating back to the late 1800s, *see* Hr'g Tr. 68:24 to 69:1 (Jan. 30, 2015),[5] when Culebra was controlled by the Spanish crown, *see* Pls.' Opp'n at 6.[6]

---

[4]The parties have filed extensive appendices to their principal motion and opposition; citations to defendant's appendices appended to its motion to dismiss are denoted as "Def.'s App. __," and plaintiffs' appendices appended to its opposition to that motion are identified as "Pls.' App. __." The documentary materials submitted by the parties contain exhibits to exhibits. For clarity, the court will refer to the exhibits to exhibits as attachments.

[5]Citations to the hearing transcript are to "Hr'g Tr. ___" and subsequent references will omit the date.

[6]Culebra was under Spanish dominion until 1898, when the Spanish-American War was resolved. Pls.' App. Ex. 3, at 10 (Decl. of Dennis Martinez (Nov. 14, 2014)). When the war ended, Spain ceded the Island to the United States pursuant to the terms established by the Treaty of Paris of 1898. Pls.' App. Ex. 3, at 20-21. Thereafter, by executive order dated December 18, 1901, President Theodore Roosevelt placed "public lands as may exist on Culebra Island . . . under the jurisdiction and control of the Navy Department." Def.'s App. Ex. A, at 1 (General Order No. 75 (Dec. 18, 1901)). To clarify ambiguity, on June 26, 1903, the President again reserved "[a]ll public lands and building thereon, belonging to the United States on the Island of

In 1887, Ramon García Saenz prepared a map subdividing the Island into several plots of land, which plots were the basis for eventual assignment to individual owners according to Sept. 13, 1894 Isla de Culebra, Puerto Rico, General State of Farm Works in compliance with Royal decree No. 547 of Oct. 16, 1888, and the Agreement of the General Government of Sept. 13, 1889 (*Estado General de los Trabajos de Cultivo en cumplimiento con la Real Orden número 547 de 16 de octubre de 1888 y Acuerdo del Gobierno General de 13 de septiembre de 1889*). *See* Pls.' Opp'n at 23 & n.86; *see also* Pls.' App. Ex. 3, at 11.  Lots 21, 23, 24, 25, and half of lot 74 were the property of Escolástico Mulero until 1903, and Lot 26 was owned by Antonio Lugo. Am. Compl. ¶¶ 18-19.  The bounds of the subject property lie within Lot 24 of the map shown below in the southeast portion of Culebra Island:



Pls.' App. Ex. 10, Attach. 3, at 1 (Map of the Island of Culebra Showing Existing Farms and Owners as of Aug. 25, 1937 (Sept. 2, 1937)).  A map of the southeast portion of Culebra Island shows Lot 24 in greater detail:

---

Culebra, . . . for naval purposes."  Def.'s App. Ex. B, at 2, ¶ 5 (Presidential Proclamation (June 26, 1903)); *see also* Def.'s Mot at 4.



Pls.' App. Ex. 3, at 24.  Mr. Mulero subsequently consolidated the properties into one parcel of land and duly registered the plot as Property 117 in the Registry of Property of Puerto Rico ("Property Registry") on May 9, 1903.  Am. Compl. ¶ 20.  The Property Registry reported the resulting boundaries for the newly consolidated lot as follows:

> RURAL: Tract of land of clean pasture dedicated for the raising of cattle, with the name Buena Vista, located at Los Fraile Ward of Culebra . . . bounded by the SOUTH and EAST with the oceans, **by the NORTH, with Mr. Antonio Lugo**, and by the West with the estate of Mr. Francisco Garcia . . .

Am. Compl. ¶ 21. (Pls.' Translation) (emphasis by plaintiffs).

On June 28, 1903, Mr. Mulero segregated a 2.25-acre plot of the land from Property 117 and sold it to the Navy as a gun mount.  *See* Def.'s App. Ex. D, Attach. 1, at 1 (Deed of Sale (June 28, 1903)).[7]  The legal description contained in the Deed set forth the following boundaries for the gun mount:

> RURAL: Tract of land of clean pasture located at the Los Fraile Ward of the Island of Culebra . . . bounded by **the NORTH, with Mr. Antonio Lugo and the ocean**, by the EAST, in a tip of land ("punta de terreno") with the ocean, by the SOUTH and WEST, with the principal property from which this tract is segregated. This property is formed by way of segregation from property number 117 . . .

---

[7]The Deed conveyed three gun mounts to the Navy; Mr. Mulero deeded one and Demetria Felix Gaudalupe deeded the other two gun mounts.  *See* Def.'s App. Ex. D, Attach. 1, at 2.

Am. Compl. ¶ 22 (Pls.' Translation) (emphasis by plaintiffs); *see also* Def.'s App. Ex. D, Attach. 1, at 1-2 (a different translation).  On account of Mr. Mulero "not knowing how to sign" and because of his wife's "failing sight," a third-party signed the Deed in the presence of a notary, who translated the Deed into English for the Navy representative.  *See* Def.'s App. Ex. D, Attach. 1, at 5-6; *see also* Hr'g Tr. 90:12-22.  Although the Deed did not assign the gun mount site to a numbered lot, the northern boundary of the deeded site in the Deed seems to be the "same [as] the original north boundary . . . of lot number 25, prior to its consolidation of other lots."  Pls.' App. Ex. 3, at 16; *see also* Am. Compl. ¶ 23.  The documentary materials submitted by the parties also contain a contract by which Mr. Mulero agreed to sell the same coastal artillery emplacement to the Navy, but that contract is dated the day *after* Mr. Mulero deeded the gun mount to the Navy.  *See* Def.'s App. Ex. D, Attach. 2, at 1-2 (Agreement of Sale (June 29, 1903)).  This contract states that the gun mount is located "in Plot Number 24 [on the] Official Chart of Culebra, U.S.W.I."  Def.'s App. Ex. D, Attach. 2, at 1.  In contrast to the Deed, the Agreement of Sale is stated in English and signed by, or by an unknown person on behalf of, Mr. Mulero, in between the words "His Mark" with a cross separating "Escolástico" and "Mulero."  Def.'s App. Ex. D, Attach. 2, at 1-2; *see also* Hr'g Tr. 90:20 to 91:10.

### B.  Parcel 4 and a Boundary Controversy

The remaining property owned by Mr. Mulero was sold and reconfigured several times during the early- to mid-1900s.  *See* Am. Compl. ¶¶ 25-36.  Ultimately, the salient land was designated as Property 270 and added to the Property Registry in 1940.  Am. Compl. ¶ 35.  A surveyor, José Gómez Velázquez, was hired to conduct a survey of Property 270, and on December 26, 1967, Property 270 was partitioned into six parcels.  Am. Compl. ¶¶ 37-38; *see also* Def.'s App. Ex. I, Attach. 3 (Gómez Velázquez Survey).  Prior to this division, the eastern border of Property 270 was identified as being "by the East, with the ocean and with lands of the [United States] Department of the Navy."  Am. Compl. ¶ 37.  None of the resulting segregated lots, however, were described as having an eastern border "with the lands of the United States Department of Navy."  Am. Compl. ¶ 39.[8]

After the segregation, Luz Kjeldsen and plaintiff Rosemarie Kjeldsen each received equal interests in Parcel 4, the subject property of this lawsuit.  Am. Compl. ¶ 41; *see also* Hr'g Tr. 30:20-22.  On February 25, 1971, Luz Kjeldsen sold her entire interest in Parcel 4 to Harry Grayson and to Dr. Herbert Katzin ("Dr. Katzin") and his wife, Annette Katzin.  Am. Compl. ¶ 42.  As a result of this transaction, Mr. Grayson and Dr. and Mrs. Katzin each owned an undivided 25 percent interest in Parcel 4.  Am. Compl. ¶ 42.  On February 2, 1978, Mr. Grayson sold his entire interest in the property to Dr. Katzin and his wife.  Am. Compl. ¶ 43.

Ten years later, on April 1, 1987, Dr. Katzin became aware that neighboring landowners were proposing a boundary adjustment with the United States Fish and Wildlife Service ("USF&WS") and notified the agency that he "would like to explore . . . the possibilities of a similar solution."  *See* Def.'s App. Ex. E, Attach. 1 (Letter from Dr. Katzin to Mr. James Pulliam

---

[8]The Katzins aver that this is "a legal impossibility under applicable [Property Registry] principles."  Am. Compl. ¶ 39.  "This is so because the subdivided properties when combined must have the same borders as the larger parcel before it was subdivided."  Def.'s Mot. at 8.

(Apr. 1, 1987)).  The letter also referred to a survey that USF&WS had performed, titled "Boundary Survey of the Culebra National Wildlife Refuge, Drawing No. BS-01, United States Department of the Interior Fish and Wildlife Service, Atlanta, Georgia, USA" ("1987 Survey"). *Id.*; *see also* Def.s' App. Ex. E, Attach. 2, at 1 (Letter from Edward M. Borges to James Pullian (Mar. 6, 1987)); Def.'s App. Ex. D, Attach. 7 (Boundary Survey of the Culebra National Wildlife Refuge, Drawing No. BS-01, United States Department of the Interior Fish and Wildlife Service, Atlanta, Georgia, USA).  Consequent to the 1987 survey, the USF&WS placed signs (called "new monuments" on the survey legend) at sites along the Island that had been designated by the map.  Def.'s App. Ex. U, ¶ 4 (Decl. of Javiar E. Bidot Cruz (Oct. 13, 2014)); *see also* Def.'s App. Ex. D, Attach. 7.  The signs stated: "Refugio Nacional de Vida Silvestre: Prohibida Entrar Sin Autorización," which translates in English to "National Wildlife Refuge: Unauthorized Entry Prohibited."  Def.'s App. Ex. U, ¶ 5 & Attach. 1, at 1-3 (Photographs).  Some of these signs still remain on the Island and on the subject property.  *See* Def.'s App. Ex. U, ¶ 4.

The USF&WS responded to Dr. Katzin on May 11, 1987 stating that it would consider his proposal for a boundary adjustment.  Def.'s App. Ex. E, Attach. 4 (Letter from Alan C. Bonsack to Dr. Katzin (May 11, 1987)).  A few weeks later, Ernesto A. Meléndez, Dr. Katzin's attorney, wrote the USF&WS regarding this exchange of correspondence.  *See* Def.'s App. Ex. E, Attach. 5 (Letter from Ernesto A. Meléndez to Jerry Vits (May 30, 1987)).  Mr. Meléndez advised that Dr. Katzin and his wife owned a 50 percent interest in Parcel 4, which is "bound[ed] 'with the Sea' by the East," and reiterated his client's "interest of seeking a satisfactory solution to the boundary controversy at hand."  Def.'s App. Ex. E, Attach. 5, at 1-2.  No further communications between the parties resulted from these expressions of interest in addressing property boundaries until 1995, when an "Agreement of Exchange of Fee Interest for Conversation Easement" was signed.  *See* Def.'s App. Ex. AA (Deed of Protocolization of Agreement of Exchange of Fee Interest for Conservation Easement (Oct. 6, 1995)); *see also* Def.'s Mot. at 16.  Under the terms of that agreement, the USF&WS was conveyed a conservation easement on the coastal border of a particular tract.  Def.'s App. Ex. AA.  In part, this deed recites that

> Grantors wish to develop a portion of the Property and the Property and the Grantees and Grantors wish to establish within the Property a uniform twenty (20) meter nondevelopment area to serve as a buffer or conservation area between Grantors' developed land or lands to be developed and the maritime terrestrial zone in order to protect the fragile environment of the seaside boundary of the [p]roperty.

Def.'s App. Ex. AA, at ¶ FOURTH.  In exchange for granting this conservation easement, the Katzins received by quitclaim "all right, title and interest in and to the property."  *Id.* at ¶ FIFTH.

Dr. Katzin died in 1995, and Annette Katzin became the lawful heir of his interest in Parcel 4.[9]  "This made Annette Katzin the true and lawful owner of a 50 [percent] undivided

---

[9]Before he died, Dr. Herbert Katzin gave his daughter, Mary Beth Katzin Simon, documents pertaining to Parcel 4.  *See* Def.'s App. Ex. Z, at 12:18-13:21 (Dep. of Mary Katzin Simon (Aug. 21, 2013)).

interest in and to [Parcel 4], in conjunction with Rosemarie Kjelsden who also own[ed] a 50 [percent] undivided interest in and to [Parcel 4]." Am. Compl. ¶ 45.  On May 18, 2004, Annette Katzin transferred her entire interest in the property to her children, Plaintiffs Mary Beth Katzin Simon and Dr. Richard Katzin. Am. Compl. ¶ 46.[10]  Presently, the Katzin family owns a 50 percent interest in Parcel 4 through the purchase from Luz Kjeldsen and Mr. Grayson, and Rosemarie Kjeldsen owns the other 50 percent interest by means of inheritance.

### C. Contract for Sale of Subject Property

On March 26, 2006, the Katzins (including Ms. Kjeldsen) entered into a contract to sell the subject property for $4 million to developers, the Klabers, doing business as UpHill, LLC. Am. Compl. ¶ 7; *see also* Pls.' App. Ex. 4, at 1 (Purchase Agreement (Mar. 26, 2006)).  The land sale contract recited that "S[eller] will convey to the B[uyer] good, legal, marketable fee simple title to the above property." *Id.*  In connection with the sale, the Katzins informed the Klabers that the USF&WS "had ownership rights to the maritime zone of the subject property and that it had previously acquired a permanent conservation easement on the adjoining property to the South, 20 meters wide, extending landward from the maritime terrestrial zone." Am. Compl. ¶ 7.[11]  During the due diligence period of the contract, Claudia Motta, the Klabers' attorney, contacted John Beasley, the Director of the Division of Reality of the USF&WS Southeast Region, for clarification regarding rights of the USF&WS to the subject property. *See* Def.'s App. Ex. CC, at 1 (E-mail from Motta to Beasley (June 15, 2006)).

In response to the inquiry, Mr. Beasley advised Ms. Motta that the USF&WS owned both the maritime zone and 2.25 acres of the subject property, which he referred to as Tract 1f. Pls.' App. Ex. 1, at 2 (Facsimile from Beasley to Motta (June 22, 2006)).  According to Mr. Beasley, "[Tract] 1f is an old gun mount site purchased by the Navy in 1903 from Escolástico Mulero" that was later transferred to the USF&WS by the Secretary of the Interior as reflected in a Notice published in the *Federal Register* on March 15, 1982. Pls.' App. Ex. 1, at 2.  Mr. Beasley provided Ms. Motta a series of documents, including: (1) a copy of a portion of the original 1887 subdivision map of Culebra; (2) a tracing of the 1887 survey; (3) the *Federal Register* notice dated March 15, 1982; (4) a land tract record; (5) a copy of a drawing showing the Buena Vista Peninsula with an area of 10.01 acres; and (6) another tracing of the 1887 survey designating the location of the Buena Vista Peninsula.  On a tracing of the 1887 survey, which is set out below, the gun mount site is shown on the eastern portion of the subject property, north of the Buena Vista Peninsula. Pls.' App. Ex. 1, at 4; *see also* Am. Compl. ¶ 10.

---

[10]The assignment to Dr. Richard Katzin and Mary Beth Katzin Simon has not yet been registered in the Property Registry, and therefore, title remains with Annette Katzin. *See* Am. Compl. ¶ 47.

[11]At the hearing plaintiffs' Puerto Rican counsel represented that "the maritime zone . . . stays within the private landowner's title, but it is delineated and it's in the nature of . . . an easement." Hr'g Tr. 78:15-20.  Counsel further advised that under Puerto Rican law, generally the maritime zone is "from the high water mark [to] 20 meters inland." Hr'g Tr. 77:13-24.



Pls.' App. Ex. 1, at 4.  As a result of Mr. Beasley's assertions, the Klabers rescinded the contract for the sale of the subject property on June 28, 2006:

> We have been informed by John Beasley of the [USF&WS] that a portion of Lot 4 is property of the [USF&WS], a fact that was not previously disclosed to our clients in the Purchase Agreement, nor was it disclosed by the title study for Lot 4 dated May 10, 2006. Our clients are not prepared to acquire Lot 4 under these circumstances.

Pls.' App. Ex. 2, at 1 (Letter from Motta to Annette Katzin, Rosemarie Kjeldsen Winters, c/o Roberto Berríos (June 28, 2006)).[12]

### D.  Gun Mount and Buena Vista Peninsula

In 2008, Lynn Robinson, Former Chief Surveyor of the USF&WS Southeast Region, performed a ground inspection on the subject property to determine the location of the gun mount; he was unsuccessful in this endeavor.  Am. Compl. ¶ 51.  Two years later, the Katzins "engaged in the task of trying to locate the [g]un [m]ount on their own, and after more than a year of research reached the conclusion that its location lies at the Northwest Boundary," which is Parcel 5 of the 1967 subdivision.  Am. Compl. ¶ 52.[13]  The Katzins communicated their

---

[12]In 2007, another projected buyer, Nirvana LLC, indicated it was interested in purchasing the subject property.  Pls.' Opp'n at 11.  The Katzins contend that this potential "deal, too, fell through because of the USF&WS's continued claim that it owned the [g]un [m]ount site." *Id.*; *see also* Am. Compl. ¶ 62.

[13]At the time of the hearing, the gun mount site identified as Tract 1f had not yet been physically located on the Island, and there is great doubt that a gun mount was ever actually installed.  *See* Hr'g Tr. 20:15 to 21:1; *see also* Pls.' App. Ex. 10, at 9 (Excerpts from Report of Javier E. Bidot Cruz (May 15, 2014), submitted on behalf of the government).

findings to the USF&WS and engaged in a series of e-mail exchanges and telephone conversations with Mr. Nicklas Holt, an attorney-representative of the USF&WS, regarding the location of the gun mount.  Am. Compl. ¶¶ 53-58.  On October 14, 2010, Mr. Holt informed the Katzins that the Navy also held an ownership interest in the Buena Vista Peninsula because "it was shown as Navy land on their survey drawing in 1947 . . . [and] [t]he Navy placed survey monuments to indicate their ownership."  Am. Compl. ¶ 59.  A concrete marker with the inscription "USN 1945" has been found in the southwest corner of the subject property.  *See* Def.'s App. Ex. E, Attach. 7 (Photographs).  However, there is no record of any deed transferring the Buena Vista Peninsula, which is at the southeastern edge of the property, to the Navy.  *See* Pls.' App. Ex. 10, at 4.

Presently, the government contends that the Navy owns the 10.01-acre Buena Vista Peninsula and that the USF&WS owns a 2.25-acre plot of land as a gun mount site, which lies within or near the borders of the Buena Vista Peninsula.  *See* Def.'s Mot. at 5-7, 37-38.

## PROCEDURAL HISTORY

The Katzins filed a complaint in this court on June 15, 2012, and an amended complaint on September 24, 2012, seeking compensation for the taking of the subject property and the rescinded contract, in effect contending that the government's claims of property interests interfered with their quiet enjoyment of the subject property and rendered it unmarketable.  *See* Compl. ¶ 1; *see also* Am. Compl. ¶¶ 63, 67.[14]  In its answer filed on October 11, 2012, the government put forward an affirmative defense of statute of limitations.  Answer to Am. Compl. at 9, ECF No. 10.  Later, on April 8, 2014, the court granted a motion by the government for leave to amend its answer to add an affirmative defense of laches.  *See Katzin v. United States*, 115 Fed. Cl. 618 (2014).  Fact discovery and expert discovery closed on March 28, 2014, and September 17, 2014, respectively.  *See* Order of Feb. 3, 2014, ECF No. 33; *see also* Order of

---

[14]Reading the two counts of their amended complaint together, in essence, the Katzins appear to be asserting a temporary taking of rights to their property.  At the hearing, counsel for the Katzins clarified that their claim for a "taking of the land[ ] is temporary. . . . [A]s long as the [g]overnment keeps knocking off prospective buyers . . . the property can't be sold.  It's simply [inalienable] until [the ownership dispute] is resolved."  Hr'g Tr. 80:20 to 81:4; *see, e.g.*, *Dwen v. United States*, 62 Fed. Cl. 76 (2004):

> After the passage of the [Quiet Title Act, 28 U.S.C. § 2409a], the government frequently argued that the [C]ourt [of Federal Claims] was divested of jurisdiction to adjudicate takings claims where resolution of a title dispute was subsumed in the determination.  That argument, however, has been firmly laid to rest.  It is now well-established the court has jurisdiction to make independent factual determinations of a claimant's specific property interest as a matter of course in adjudicating takings claims.

62 Fed. Cl. at 81 (citations omitted).

Sept. 24, 2014, ECF No. 47.  On October 14, 2014, the government filed a motion to dismiss the case for lack of subject matter jurisdiction under RCFC 12(b)(1).  *See* Def.'s Mot.  The government contends that the Katzins' claims are time-barred under 28 U.S.C. § 2501, or are otherwise barred under the equitable doctrine of laches.  *See id.* at 1, 36.  In the alternative, the government requests that the court grant summary judgment pursuant to RCFC 56, insisting that the Katzins lack standing to assert their claims and that their claim for the taking of the rescinded contract is without merit.  *See id.* at 1.  In the Katzins's opposition to the government's motion, filed on November 14, 2014, they among other things rely upon a declaration by an expert, Dennis Martinez, and the Armar title report to support their ownership and thus their standing.  *See generally* Pls.' Opp'n.  In that connection, on December 9, 2014, the government filed a motion to strike the declaration of Mr. Martinez and the Armar title report.  Def.'s Mot. to Strike.  A hearing on the pending motions was held on January 30, 2015.  The case is now ready for disposition.

## STANDARDS FOR DECISION

### A.  Jurisdictional Time-Bar

Before addressing the merits, a "court must satisfy itself that it has jurisdiction to hear and decide a case."  *Hardie v. United States*, 367 F.3d 1288, 1290 (Fed. Cir. 2004) (quoting *PIN/NIP, Inc. v. Platte Chem. Co.*, 304 F.3d 1235, 1241 (Fed. Cir. 2002) (citing *View Eng'g, Inc. v. Robotic Vision Sys., Inc.*, 115 F.3d 962, 963 (Fed. Cir. 1997))).  When assessing jurisdiction, the court will ordinarily "consider the facts alleged in the complaint to be true and correct." *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988) (citing *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974); *Air Prod. & Chems., Inc. v. Reichhold Chems., Inc.*, 755 F.2d 1559, 1562 n.4 (Fed. Cir. 1985)).  However, when the court's subject matter jurisdiction has been called into question by a motion filed under RCFC 12(b)(1), the burden of establishing jurisdiction is placed upon the party seeking to invoke it, *McNutt v. Gen. Motors Acceptance Corp. of Ind.*, 298 U.S. 178, 189 (1936), and this burden must be proven by a preponderance of the evidence, *Reynolds*, 846 F.2d at 748 (citing *Zunamon v. Brown*, 418 F.2d 883, 886 (8th Cir. 1969) (quoting *McNutt*, 298 U.S. at 189, and citing *Jascourt v. United States*, 521 F.2d 1406 (Ct. Cl. 1975))).

The Katzins premise this court's jurisdiction on the Tucker Act, 28 U.S.C. § 1491(a)(1). Am. Compl ¶ 6.  The Tucker Act grants this court "jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort."  28 U.S.C. § 1491(a)(1).  Actions brought under the Tucker Act are time-barred unless the claim "is filed within six years after such claim first accrues." 28 U.S.C. § 2501.  The time-bar specified in Section 2501 is jurisdictional, *John R. Sand & Gravel Co. v. United States*, 552 U.S. 130, 134 (2008), and the plaintiff bears the burden of proving by a preponderance of the evidence that the complaint was timely filed, *cf. Sikorsky Aircraft Corp. v. United States*, 773 F.3d 1315, 1320-22 (Fed. Cir. 2014) (ruling by contrast that the statute of limitations set out in the Contract Disputes Act, 41 U.S.C. § 7103, is not jurisdictional, placing that statute of limitations in the realm of those subject to RCFC 8(c) (listing "statute of limitations" among affirmative defenses)).  In

short, a plaintiff's failure to meet the requirements of 28 U.S.C. § 2501 places the claim beyond the court's juridical power to hear the case. *See McDonald v. United States*, 37 Fed. Cl. 110, 113 (1997), *aff'd*, 135 F.3d 778 (Fed. Cir. 1998); *see also Catellus Dev. Corp. v. United States*, 31 Fed. Cl. 399, 404 (1994) (citing *Soriano v. United States*, 352 U.S. 270, 273 (1957)).

As a general matter, a cause of action accrues "when all the events which fix the government's alleged liability have occurred *and* the plaintiff was or should have been aware of their existence." *Hopland Band of Pomo Indians v. United States*, 855 F.2d 1573, 1577 (Fed. Cir. 1988); *see also Ingrum v. United States*, 560 F.3d 1311, 1314 (Fed. Cir. 2009); *BMR Gold Corp. v. United States*, 41 Fed. Cl. 277, 280 (1998). In determining the date of accrual, the court applies an objective standard. *Fallini v. United States*, 56 F.3d 1378, 1380 (Fed. Cir. 1995). Accordingly, the "plaintiff does not have to possess actual knowledge of all the relevant facts in order for the cause of action to accrue." *Id.* (citing *Menominee Tribe of Indians v. United States*, 726 F.2d 718, 721 (Fed. Cir. 1984)); *see also Higgins v. United States*, 589 Fed. Appx. 977, 980 (Fed. Cir. 2014).

## B. Equitable Doctrine of Laches

The equitable doctrine of laches is derived from the axiom, "'vigilantibus non dormientibus aequitas subvenit,' meaning 'equity aids the vigilant, not those who sleep on their rights.'" *Ikelionwu v. United States*, 150 F.3d 233, 237 (2d Cir. 1998) (quoting *Ivani Contracting Corp. v. City of New York*, 103 F.3d 257, 259 (2d Cir. 1997)). "Because laches is an equitable doctrine, in actions at law for which 'a limitation on the period for bringing suit has been set by statute, laches will generally not be invoked to shorten the statutory period.'" *Lankster v. United States*, 87 Fed. Cl. 747, 755 (2009) (quoting *Advanced Cardiovascular Sys. v. SciMed Life Sys.*, 988 F.2d 1157, 1161 (Fed. Cir. 1993)). "'As a conceptual matter, an exception to this general rule may be established upon a showing of sufficient prejudice to the government, and in this respect the government bears a relatively heavy burden of proof.'" *Id.* (quoting *Cygnus Corp. v. United States*, 63 Fed. Cl. 150, 154 (2004), *aff'd*, 177 Fed. Appx. 86 (Fed. Cir. 2006) (in turn citing *Cornetta v. United States*, 851 F.2d 1372, 1380 (Fed. Cir. 1988) (en banc))).

For the government to prevail on an affirmative defense of laches, it must demonstrate that (1) "the plaintiff delayed filing suit for an unreasonable and inexcusable length of time from the time the plaintiff knew or reasonably should have known of its claim against the defendant," and (2) that "the delay [by the claimant] operated to the prejudice or injury of the defendant." *Lankster*, 87 Fed. Cl. at 755 (alteration in original) (quoting *A.C. Aukerman Co. v. R.L. Chaides Const. Co.*, 960 F.2d 1020, 1032 (Fed. Cir. 1992)). A mere passage of time, even if extended, does not by itself constitute prejudice. *Abernethy v. United States*, 108 Fed. Cl. 183, 190 (2012). To demonstrate prejudice, the government must show defense prejudice, "whereby the defendant is impaired from successfully defending itself from suit given the passage of time" or economic prejudice, "whereby the costs to the defendant have significantly increased due to the delay." *Id.* (citing *Cornetta*, 851 F.2d at 1378; *Lankster*, 87 Fed. Cl. at 755-56). "'Defense prejudice' may include loss of records, destruction of evidence, fading memories, or unavailability of witnesses[,]' while "economic prejudice[ ] centers on consequences, primarily monetary, [that the government will endure] should the claimant prevail." *Lankster*, 87 Fed. Cl. at 755-56 (alteration in original) (quoting *Cornetta*, 851 F.2d at 1378).

### C.  Summary Judgment

Summary judgment is appropriate when the pleadings, affidavits, and evidentiary materials filed in a case reveal that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  RCFC 56(a).  A material fact is one "that might affect the outcome of the suit under the governing law," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), and a genuine dispute is one that "may reasonably be resolved in favor of either party," *id.* at 250.  The moving party has the burden of demonstrating the absence of such genuine disputes.  Accordingly, "the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The non-moving party may defeat summary judgment by presenting material facts of its own, more than "[m]ere denials or conclusory statements," which indicate "an evidentiary conflict created on the record."  *Barmag Barmer Maschinenfabrik AG v. Murata Mach., Ltd.*, 731 F.2d 831, 836 (Fed. Cir. 1984).  The court may grant summary judgment "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party."  *Matsushita*, 475 U.S. at 599 (alteration in original) (citations omitted).

## ANALYSIS

## I.  MOTION TO STRIKE

The government's motion to strike the declaration of Mr. Martinez and the Armar title report turns on RCFC 56(c)(4) and should be addressed as an initial matter.  *See Boston Edison Co. v. United States*, 64 Fed. Cl. 167, 180 (2005) ("Because the motion to strike raises a threshold issue, that motion is addressed initially."); *see also Thomas v. United States*, 106 Fed. Cl. 467, 476 n.4 (2012).[15]  The government avers that the court should strike Mr. Martinez's declaration because he offers only inadmissible legal opinions under Fed. R. Evid. 702.  Def.'s

---

[15]RCFC 56(c)(4) provides as follows:

> An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

RCFC 56(c)(4).  "Subdivision (c)(4) [of RCFC 56 is identical to Fed. R. Civ. P. 56(c)(4), and thus] carries forward some of the provisions of former subdivision (e)(1)."  Fed. R. Civ. P. 56 advisory committee's note, 2010 amendments, subdivision (c).  The court in *Boston Edison* applied RCFC 56(e) as it was then in effect.

Mot. to Strike at 1.  Additionally, the government moves to strike the Armar title report on the ground that it constitutes inadmissible hearsay under Fed. R. Evid. 801.  *Id.* at 9.

### A.  *Martinez Declaration*

In his declaration, Mr. Martinez proffers the following three opinions: (1) title to Parcel 4 is held by the Katzins; (2) the 2.25-acre gun mount site is not located in Parcel 4, but rather lies within the boundaries of Parcel 5, and (3) the United States has no valid title to the Buena Vista Peninsula, which is part of Parcel 4 and is owned by the Katzins.  Pls.' App. Ex. 3 (Martinez Decl.), ¶ 6.  The government characterizes these assertions as nothing more than "legal opinions [prohibited under Fed. R. Evid. 702] because Mr. Martinez reached his opinions by applying the law of Puerto Rico to the facts of this case."  Def.'s Mot. to Strike at 5; *see also* Hr'g Tr. 50:19-25, 51:11-19.  Fed. R. Evid. 702, governing testimony by experts, provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  Expert testimony that amounts to an opinion of law is strongly disfavored by federal courts.  *See Sparton Corp. v. United States*, 77 Fed. Cl. 1, 7 (2007) ("In general, federal courts have found expert testimony on issues of law, either giving a legal conclusion or discussing the legal implications of evidence, to be inadmissible."); *see also Burkhart v. Washington Metro. Area Transit Auth.*, 112 F.3d 1207, 1213 (D.C. Cir. 1997) ("Each courtroom comes equipped with a 'legal expert,' called a judge, and it is his or her province alone to instruct the jury on the relevant legal standards."); *Specht v. Jensen*, 853 F.2d 805, 807 (10th Cir. 1988) ("A witness cannot be allowed to give an opinion on a question of law. . . .  There being only one applicable legal rule for each dispute or issue, it requires only one spokesman of the law, who of course is the judge. . . .  [I]t would be a waste of time if witnesses or counsel should duplicate the judge's statement of the law, and it would intolerably confound the jury to have it stated differently.") (quoting Stoebuck, *Opinions on Ultimate Facts: Status, Trends, and a Note of Caution*, 41 Den. L. Cent. J. 226, 237 (1964) (footnote omitted)).

In support of its contention, the government points to two cases in which the court found that testimony and reports from experts amounted to inadmissible legal opinions under Fed. R.

Evid. 702. Def.'s Mot to Strike at 6-7. In *Stobie Creek Investments, LLC v. United States*, 81 Fed. Cl. 358 (2008), plaintiffs proffered expert testimony and reports from a tax professor and tax attorney regarding the pertinent law. The first report contained an extensive discussion of "cases concerning the economic substance doctrine, the imposition of penalties, and the reasonable cause defense," *id.* at 359, and the second report included an "exhaustive analysis of Treasury Circular 230, 31 C.F.R. §§ 10.0-.93, and a recitation of how [a tax opinion letter relevant to plaintiffs' claim] fulfills the requirements established by Treasury Circular 230," *id.* The court concluded that both expert reports were "lengthy legal analyses of past precedent, complemented by arguments attempting to persuade the court that plaintiffs reasonably relied on the legal opinions in a law firm's tax opinion letter." *Id.* at 363. Because the experts were "applying the law to the facts," the court excluded the expert testimony. *Id.* at 364. Likewise, in *Thomas*, 106 Fed. Cl. at 476 n.4, the plaintiffs attached an affidavit of a real estate attorney to their motion for summary judgment setting forth an opinion as to whether the plaintiffs owned a reversionary interest under Tennessee law. Citing *Stobie Creek*, the court disregarded the affidavit as evidence because it was a legal opinion. *Id.* Based upon *Stobie Creek* and *Thomas*, the government urges the court to act as a gatekeeper and exclude the declaration of Mr. Martinez. Def.'s Mot to Strike at 7.

The Katzins respond that Mr. Martinez is not offering inadmissible legal opinions. *See* Pls.' Opp'n to the Gov't's Mot. to Strike ("Pls.' Opp'n to Mot. to Strike") at 7, 12, ECF No. 54. Although Mr. Martinez reaches a legal conclusion as to ownership of the disputed parcels of land, testimony that embraces an "ultimate issue" in a case is not per se inadmissible under Fed. R. Evid. 704. *Id.*; *see also* Fed. R. Evid. 704 ("An opinion is not objectionable just because it embraces an ultimate issue.").[16] The advisory committee note for Fed. R. Evid. 704 states,

> The basic approach to opinions, lay and expert, in these rules is to admit them when helpful to the trier of fact. In order to render this approach fully effective and to allay any doubt on the subject, the so-called "ultimate issue" rule is specifically abolished by the instant rule.

Fed. R. Evid. 704, advisory committee note (1972). Nonetheless, expert testimony on an ultimate issue that would *not* assist the court, *i.e.* the trier of fact, in understanding the evidence or determining a disputed fact is still objectionable. *Stobie Creek*, 81 Fed. Cl. at 363. Ultimately, the admissibility of testimony that may involve a legal conclusion rests upon whether that opinion will aid the court in resolving the factual issues presented in the case. *Id.* (citing 29 Charles Alan Wright & Victor James Gold, *Federal Practice & Procedure* § 6284 (2008)).

The Katzins opine that the opinions of Mr. Martinez are based upon his expertise in the title registration process used in Puerto Rico and are the result of "many hours of research in the official records of Puerto Rico solely to assist this [c]ourt in deciding the issues before it in the

---

[16]The Katzins acknowledge that opinions of title may be considered legal opinions. Pls.' Opp'n to Mot. to Strike at 7. Indeed, during his deposition, Mr. Martinez characterized his assessments of ownership as "legal opinions." Def.'s Mot. to Strike App. Ex. A, at 31:9 to 32:5 (Dep. of Dennis Martinez (Sept. 17, 2014)).

[g]overnment's motion to dismiss." Pls.' Opp'n to Mot. to Strike at 12. The testimony of Mr. Martinez helps "navigat[e] the complex century-long chain of title in this case (much of which is in Spanish)." *Id.* Plaintiffs argue that the opinion of Mr. Martinez is wholly unlike the expert testimony and reports that were excluded in *Stobie Creek* and *Thomas*. In those cases, expert testimony was not helpful and invaded the province of the court because it comprised legal conclusions based on the construction and interpretation of the pertinent laws. *See Stobie Creek*, 81 Fed. Cl. at 363; *see also Thomas*, 106 Fed. Cl. at 476 n.4. Here, Mr. Martinez is not instructing the court on the law and its application. Rather, his opinion is derived from a review of a "century's worth of deed boundary descriptions and transfer information," Pls.' Opp'n to Mot. to Strike at 14-15, and assists the court in understanding the foundational facts at issue in the case. *Compare Nat'l Assistance Bureau, Inc. v. Macon Mem'l Intermediate Care Home, Inc.*, 714 F. Supp. 2d 1192, 1202 (M.D. Ga. 2009) (permitting expert testimony of a title examiner where the subject matter of the testimony was "outside the understanding of the typical juror and would assist the trier of fact in understanding the evidence in this case"), *with Rumsfeld v. United Technologies Corp.*, 315 F.3d 1361, 1369 (Fed. Cir. 2003) (holding that testimony interpreting the Cost Accounting Standards was an issue of law and "should not be received, much less considered, by the [court]").

The court concludes that the fact that Mr. Martinez states an opinion as to an ultimate issue in this case does not usurp the role of the court and "here, where the court is acting as the trier of fact, the dangers which can be presented by such 'ultimate issue' [opinions] are minimal if not nonexistent." *Martin v. Indiana Mich. Power Co.*, 292 F. Supp. 2d 947, 959 (W.D. Mich. 2002); *see also Gulf Grp. Gen. Enterprises Co. W.L.L. v. United States*, 98 Fed. Cl. 639, 643 (2011). Consequently, the court refuses to exclude the declaration of Mr. Martinez at this stage of the proceedings.

## B. *Armar Title Report*

The Armar title report was prepared over eight years ago for Ms. Motta in connection with the then-projected sale of the subject property to the Klabers. *See* Pls.' App. Ex. 5 (Armar Title Report (May 10, 2006)). The government argues that this report constitutes inadmissible hearsay under Fed. R. Evid. 801. United States' Reply in Support of its Mot. to Strike the Decl. of Dennis Martinez and the Title Report of Armar Title Services, Inc. (Def.'s Reply for Mot. to Strike") at 8, ECF No. 58.[17] Fed. R. Evid. 801(c) defines hearsay as follows:

---

[17]The government also characterized the Armar title report as an expert witness opinion under Fed. R. Evid. 702 and moved to strike this report pursuant to RCFC 26(a)(2) and 37(c)(1) because it was not disclosed during expert discovery. Def.'s Mot. to Strike at 7. This argument was made by the government "because it believed that [the Katzins] might attempt to argue that the report constituted an admissible expert opinion." Def.'s Reply to Mot. to Strike at 8. The Katzins responded that the report was not expert testimony and was prepared "for reasons that had nothing to do with this lawsuit." Pls. Opp'n to Mot. to Strike at 16-17. Given that response, the government withdrew its contention that the report was an expert opinion prepared for this case as being moot. Def.'s Reply to Mot. to Strike at 8.

'Hearsay'" means a statement that:

> (1) the declarant does not make while testifying at the
>     current trial or hearing; and

> (2) a party offers in evidence to prove the truth of the
>     matter asserted in the statement.

Fed. R. Evid. 801(c)(1), (2).  The Katzins argue that the Armar title report is not hearsay because the statements contained in the report are not being offered to prove the truth of the matter asserted.  Pls.' Opp'n to Mot. to Strike at 18.  Instead, the report is being offered "to rebut the [g]overnment's argument . . . that the Katzins knew of the government's title claim prior to June 22, 2006."  *Id.*; *see also* Hr'g Tr. 85:25 to 86:22.[18]  The government disputes this assertion and contends that the Katzins are using the title report to prove the truth of the matter asserted in the document, *i.e.* that they hold title to the subject property.  *See* Def.'s Reply to Mot. to Strike at 10.  At this point, the hearsay challenge is not ripe for decision.  Should the Katzins choose to use the Armar title report for the truth of the matter asserted, any resulting hearsay may be cured by providing a witness to testify as to the authenticity and preparation of the document. Furthermore, the Armar title report bears on what the Katzins knew regarding title to the subject property during the year 2006.  Given that the report provides evidence of notice (or lack of notice) and that the hearsay contention is premature, the court declines to strike the Armar title report.

## II.  MOTION TO DISMISS

### A.  *Jurisdictional Time-Bar*

In addressing whether the Katzins' claim is time-barred under 28 U.S.C § 2501, the court must identify when the claim first accrued.  The Katzins aver that their claim accrued on June 28, 2006, when the Klabers rescinded the contract to purchase the subject property after being notified by Mr. Beasley of the USF&WS's claim to Tract 1f.  Pls.' Opp'n at 16.  The Katzins base this assertion on the ground that this was the date when the government first "interfere[d] with their ability to sell the property."  Hr'g Tr. 62:12-15, 65:10-17; *see also* Pls.' Opp'n at 18. Conversely, the government contends that the Katzins' claim first accrued in the 1980s, arguing that this was when the Katzins "knew or should have known of the United States' claim of ownership [to the disputed parcels of land]."  Def.'s Mot. at 26; *see also* Def.'s Reply at 6. According to the government, the United States claimed ownership over the subject property by means of documents made available through notices appearing in the *Federal Register*, through public meetings held in Puerto Rico regarding those notices, and by placing cement markers and

---

[18]The Katzins also argue that if the Armar title report is found to be hearsay, it is nonetheless admissible under Fed. R. Evid. 807, a residual exception to the hearsay rule.  Pls.' Opp'n to Mot. to Strike at 18.  The exception provides that "a hearsay statement is not excluded by the rule against hearsay even if the statement is not specifically covered by a hearsay exception . . . [if] the statement has equivalent circumstantial guarantees of trustworthiness." Fed. R. Evid. 807(a)(1).

signs on the subject property.  Def.'s Mot. at 10-13, 29-30.   Notices by themselves do not suffice, however, even if the notices addressed the property as if it belonged to the United States. A takings claim brought under the Fifth Amendment does not accrue based on the United States' "mere assertion of title."  *See Cent. Pines Land Co. v. United States*, 107 Fed. Cl. 310, 325 (2010) ("In order to establish a taking, something more than the mere assertion of title [or of ownership] is required.").  Rather, the cause of action accrues when the United States interferes with a plaintiff's property rights.  *See id.*; *see also Yuba Goldfields, Inc. v. United States*, 723 F.2d 884, 889 (Fed. Cir. 1983) ( "[W]hat counts [for a takings claim] is not what [the] government said it was doing, or what it later says its intent was, or whether it may have used the language of a proprietor.  What counts is what the government *did*." (emphasis in original) (citing *Hughes v. Washington*, 389 U.S. 290, 298 (1967) (Stewart, J., concurring)); *Otay Mesa Prop. L.P. v. United States*, 86 Fed. Cl. 774, 786 (2009), *aff'd in part, vacated in part, and remanded*, 670 F.3d 1358 (Fed. Cir. 2012) ("The [c]ourt's inquiry into a claim's accrual under the statute of limitations is highly fact-specific. . . .  One test is whether the [g]overnment's activity materially and substantially interferes with the plaintiff's use and enjoyment of his property.") (internal citations omitted).  Therefore, the crucial issue in this case is when the United States first interfered with the Katzins' enjoyment of the subject property.

    Here, public documents and meetings from the 1980s involved the proposed distribution of Navy land on the Island and the transfer of ownership to the USF&WS; they are inchoate, however, as to whether the United States did anything to interfere with the Katzins' use and enjoyment of the subject property.  *See, e.g.*, Def.'s App. Ex. D, Attach. 5 (Records of Scoping Meeting (Apr. 7, 1980)); Def.'s App. Ex. M (Final Environmental Impact Statement (Sept. 1980)); Islands of Culebra and Culebrita, Puerto Rico; Proposed Disposition and Administration of Lands Declared Excess by U.S. Navy; Availability of Draft Environmental Impact Statement, 45 Fed. Reg. 84157-02 (Dec. 22, 1980); Record of Decision on Proposed Disposition and Administration of Lands Declared Excess by U.S. Navy on the Islands of Culebra and Culebrita in Puerto Rico, 47 Fed. Reg. 11,114-15 (Mar. 15, 1982).

    Additionally, placement of signs in the late 1980s, *see supra*, at 7, did not then, and does not now, constitute an evident interference with the Katzins' property rights, because there has been considerable confusion regarding the maritime-terrestrial zone, *see supra*, at 7; *see also* Hr'g Tr. 102:10-24.[19]  Arguably, those markers may have been placed on the property "for the purpose of marking the boundaries of the maritime zone and have nothing to do with the [current dispute]."  Hr'g Tr. 74:9-11.[20]  Because the government did not *do* anything that interfered with

---

[19]Likewise, the placement of a cement marker with the inscription "USN 1945" on the subject property does not amount to an interference with the Katzins' property rights.  *See* Def.'s App. Ex. E, Attach. 7.  Based on the record before it, the court cannot determine what the marker represents and given its location near the water at the *southwestern*, not southeastern, corner of the subject property, it too may relate the maritime zone.  *See* Def.'s App. Ex. E, Attach. 7; *see also* Def.'s App. Ex. E, Attach 6 (P.W. Drawing No. 2747, Property Map Showing Parcels Acquired for Gun Mounts by the U.S. Government (Aug. 1947)); Hr'g Tr. 70:4-14.

[20]To further support its argument that the Katzins' claim accrued before 2006, the government avers that "the United States was shown as the owner of the peninsula in Puerto

the Katzins' use, enjoyment, and marketability of the subject property in the 1980s, its actions were insufficient to trigger the statute of limitations at that time.

In the alternative, the government avers that the Katzins' claim accrued no later than 1994 when Susan Rice, Assistant Refuge Manager of the USF&WS, met with an individual on Culebra who identified himself to be a representative of the Katzins. Def.'s Mot. at 31-32. At the meeting, Ms. Rice recalled that she "discussed a land dispute between the [USF&WS] and the Katzins over the ownership of 2.25-acre and 10-acre gun mount tracts that the [USF&WS] had obtained from the Navy." Def.'s App. Ex. W, ¶ 7 (Rice Decl. (Oct 10, 2014)). Her hand-written notes from the meeting state, "Buena Vista Gun Mount . . . only problem area, 10 ac 2.2 ac, Want a written thing to be able to sell property. Mean-high tide – walk with Félix and Katzins' representative." Def.'s App. Ex. W, Attach. 1 (Rice Notes (July 7, 1994)). However, Ms. Rice cannot recall the name of the person who allegedly represented Dr. Katzin. Pls.' App. Ex. 12, at 22:21 to 23:2 (Rice Dep. (Oct. 9, 2013)); *see also* Hr'g Tr. 106:12-25. Based on the record, the court cannot conclude that the unnamed individual had the authority to represent Dr. Katzin, or that Dr. Katzin was aware of the conversation with Ms. Rice, or that the notations regarding the existence of a "land dispute" amounted to an interference with the Katzins' property rights. Moreover, the government has never claimed a ten-acre tract as a gun mount site. Notably also, this meeting would have occurred almost exactly a year before the Katzins and the USF&WS signed an "Agreement of Exchange of Fee Interest for Conservation Easement," *see* Def.'s App. Ex. AA (Deed of Protocalization of Agreement of Exchange of Fee Interest for Conservation Easement (Oct. 6, 1995)), by which the Katzins received a quitclaim deed to property in exchange for granting a conservation easement on the coastal border, *id.* In sum, nothing in Ms. Rice's notes of a meeting advances the government's contention that the Katzins' current claim accrued in October 1994.[21]

The court finds that the first instance of actual interference with the Katzins' use and possession of the subject property was on June 28, 2006. The causal force of the interference was the USF&WS's assertion to the Klabers, on June 22, 2006, that it had a claim over the subject property, which resulted in the projected purchasers, on June 28, 2006, refusing to proceed with the sale. Pls.' Opp'n at 16, 18.[22] This assertion by the government rendered the

---

Rican tax records, and neither [p]laintiffs nor their predecessors ever paid taxes on the peninsula property." Def.'s Reply at 11 (citing Def.'s Reply at 4 and Def.'s App. Exs. Q (Dep. of Alexis Mojica Rodrìquez (Nov. 5, 2013) & S (Dep. of Mirnaly Torres Dìaz (Nov. 3, 2013)). Nonetheless, the Katzins were paying real property taxes on Parcel 4, Def.'s App. Ex. Q which according to title records, includes the Buena Vista Peninsula, *see supra*, at 5-8. Moreover, the government did not even assert ownership of the peninsula until October 2010. *See supra*, at 10. The government's claim to the peninsula thus weakens, not strengthens the government's statute-of-limitations contention.

[21]Dr. Katzin died shortly after this meeting. *See* Hr'g Tr. 106:22-23.

[22]Prior to this time, the Katzins argue that "[Dr.] Richard Katzin[] was unaware that the [g]overnment asserted any title claim to a portion of Lot 4 other than the maritime zone, which is in the public domain," Pl.'s Opp'n at 9, and "they would not have contractually agreed to convey

subject property inalienable as a practical matter, pending resolution of the ownership issue. Hr'g Tr. 80:23-81:4. Consequently, all events which fix the government's alleged liability occurred on June 28, 2006, and the Katzins objectively gained knowledge of the events and consequences at that time. *See Hopland*, 855 F.2d at 1577. Because the date of first accrual in this case, June 28, 2006, falls within the six-year limitations period, the Katzins' claim is not time-barred under 28 U.S.C § 2501.

### B.  Equitable Doctrine of Laches

The government argues that the equitable doctrine of laches bars the Katzins' claim because "the United States has suffered defense prejudice by [the Katzins'] delay in bringing its claims." Def.'s Mot. at 36. While the Katzins' filed their complaint just short of six years after their claim had accrued, it was within the time prescribed by 28 U.S.C. § 2501.[23] Consequently, the government bears a "relatively heavy burden of proof" of showing sufficient defense prejudice to invoke laches "'to shorten the statutory period.'" *Lankster*, 87 Fed. Cl. at 755 (citing *Cornetta*, 851 F.2d at 1380, and then quoting *Advanced Cardiovascular Sys.*, 988 F.2d at 1161); *see also Six v. United States*, 71 Fed. Cl. 671, 681 (2006).[24] The dispositive issue, therefore, is whether the government has shown sufficient "defense prejudice" to justify a dismissal of the Katzins' claim based on laches. *Id.*; *see also Starr Int'l Co., Inc. v. United States*, No. 11-779C, 2013 WL 5976244, at *2 (Fed. Cl. Nov. 8, 2013).

The government argues that "[d]ue to the passage of time, the United States' counsel has not located former Navy personnel who are familiar with the Navy's actions . . . which could further bolster the United States' statute of limitations defense." Def.'s Mot. at 36; *see* Hr'g Tr. 101:1-4. The government further maintains that its ability to mount a statute of limitations defense has been impaired because essential witnesses have passed away, memories have faded, and documents may have been lost. *See* Def.'s Mot. at 36-37; *see also* Def.'s Reply at 18. These averments of prejudice lack persuasive force. *Cf. Crispino v. United States*, 3 Cl. Ct. 306, 311 (1983) (rejecting defendant's argument that "prejudice should be presumed because relevant documents probably have been destroyed and witnesses may be unavailable or their memories may have faded").

Although a long chain of events is involved in this case, and potential witnesses have died and memories have faded, it is not readily apparent that the resulting deficit in evidence would support the government's statute of limitations contention. For example, Dr. Herbert Katzin died several years before the Katzins' claim for a taking accrued; he could not have

---

good title to the entire parcel had [the Armar] title report shown any defect in their title," Pls.' Opp'n to Mot. to Strike at 18.

[23]After the Klabers rescinded the contract on June 28, 2006, the Katzins attempted to resolve the ownership dispute with the USF&WS before filing suit. Pls.' Opp'n at 35. Given the failure of that effort, on June 15, 2012, the Katzins' filed their complaint in this court.

[24]The Katzins did not unreasonably or inexcusably delay filing suit because they commendably first endeavored to resolve the dispute over ownership without litigation. *See supra*, n.23.

provided any testimony supporting the government's statute of limitations defense.  *See* Pls.'
Opp'n at 36.   Likewise, Ms. Rice's "memory of events [from 1994] would be clearer if she
were asked closer to the date of the conversation," Def.'s Mot. at 37 (citing Def.'s App. Ex. W,
¶¶ 18-19), but her testimony relates to a meeting that occurred in 1994, a year before an
exchange of deeds between the parties in 1995 that all concede was effective to resolve one
dispute over land.  Additionally, the title records appear to be intact and available, and it is not
evident what other documentation might have been helpful for the government.  "In the face of
questions regarding what documents or testimony may be missing and their relevance, the
[c]ourt cannot say that the defendants, at this time, have shown material prejudice from any
purported absence of evidence." *Avocent Redmond Corp. v. United States*, 93 Fed. Cl. 399, 405
(2010).  The government has not shown an impairment of its ability to defend the lawsuit or
other extraordinary circumstances that would warrant an equitable imposition of a shorter
period for filing suit than that provided by 28 U.S.C. § 2501.  For the reasons stated, the court
rejects the laches defense posited by the government.

### III.  MOTION FOR SUMMARY JUDGMENT

The government has also moved for summary judgment in its favor, claiming that the
Katzins cannot establish that they own a compensable property interest in the subject property
that they claim was taken by the United States.  Def.'s Mot. at 37-38; *see also* Def.'s Reply at 19.
The government's motion is grounded on its contention that the United States owns the Buena
Vista Peninsula and purchased the gun mount site in 1903 carved out of what was then Lot 24
rather than Lot 25.  Def.'s Mot. at 6.  The request for summary judgment is not viable because
many genuine issues of material fact exist in this case.

First, the government lacks any support in the title history that ownership of Buena Vista
Peninsula was ever transferred to the United States, *see* Pls.' Opp'n at 31-32.  Second, the
location of the maritime zone, especially as it relates to the Buena Vista Peninsula, is undefined,
as is the conservation easement acquired by the government from the Katzins in 1995.  *See* Hr'g
Tr. 102:10-24; *see also* Def.'s Mot. at 31-32; Pls.' Opp'n at 32-34.  Third, the location of the
2.25-acre gun mount site is disputed.  Based on several maps prepared by the Navy and an
Agreement of Sale from June 29, 1903, *see supra*, at 8-9, the government claims that the Navy
placed the gun mount site on or near the Buena Vista Peninsula.  Def.'s Mot. at 6.  The Katzins
insist that the gun mount site is located north of the subject property, lying within what was Lot
25 in 1903.  Pls.' Opp'n at 4-5; *see also* Pls.' App. Ex. 3, ¶ 6.  The Katzins' position on title is
based on a map prepared by Ramon García Saenz in 1887 and the legal description contained in
the Deed dated June 28, 1903.  *See supra*, at 5; *see also* Pls.' Opp'n at 24-25.  The Katzins also
question why, assuming that the government somehow had acquired the Buena Vista Peninsula,
the government would buy the gun mount site located on land it already owned.  Hr'g Tr. 74:18-
21.  They also challenge the reliability of the government's evidence, especially the Agreement
of Sale dated a day after the Deed for the gun mount site.  *See* Pls.' Opp'n at 11-12, 23-28.
Notably, having reviewed the maps proffered by the government, the court concludes that the
cartographic evidence is indeed inconsistent.  *See, e.g.*, Def.'s App. Ex. E, Attach. 6 (Property
Map Showing Parcels Acquired for Gun Mounts by the U.S. Gov't (Aug. 1947)); Def.'s App.
Ex. D, Attach. 3 (U.S. Naval Station Roosevelt Roads Culebra Island Real Estate Summary
Map); Def.'s App. Ex.  F (Map of the Island of Culebra Showing Existing Farms and Owners

(Aug. 25, 1937)); Def.'s App. Ex. E, Attach. 3 (Aerial Photograph - La Pela Bay, Culebra, Puerto Rico); Pls.' App. Ex. 10, Attachs. 4 (USF&WS, Division of Realty, Map of Culebra (1975)) & 6 (United States Department of Interior and USF&WS, Culebra National Wildlife Refuge, Culebra Island Group—Puerto Rico (Nov. 1992)); *see also* Hr'g Tr. 95:22-23.

It is evident to the court that genuine issues of material fact exist as to ownership. Resolution of these issues will depend upon interpretations of century-old land records and maps, some of which are in Spanish, and will require definitive explication of the chain of title. Considering all nuances of this case, the court remits for trial the issues of ownership involving the subject property. *See P.R. Burke Corp. v. United States*, 58 Fed. Cl. 549, 553-54 (2003) ("Caution is imperative [when granting summary judgment] because '[t]hough speedy and inexpensive, summary judgment is nonetheless a lethal weapon capable of overkill.'") (internal quotations omitted) (quoting *SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1116 (Fed. Cir. 1985))).

In sum, the court declines to grant the government's motion for summary judgment.[25]

## CONCLUSION

For the reasons stated, the government's motion to strike the declaration of Mr. Dennis Martinez and the Armar title report under RCFC 56(c)(4) is DENIED.  The government's motion to dismiss the amended complaint pursuant to RCFC 12(b)(1) is DENIED.  The Katzins' claim is not time-barred under 28 U.S.C. § 2501, and the equitable doctrine of laches does not apply to shorten the period for bringing suit.  The government's motion for summary judgment under RCFC 56 is DENIED because disputed issues of material fact exist regarding ownership of the relevant land.

Given that discovery is now complete, the parties are requested to provide by April 2, 2015, a plan and schedule for bringing this case to trial.

It is so ORDERED.

s/ Charles F. Lettow
Charles F. Lettow
Judge

---

[25]The government also requests that the court grant summary judgment on the Katzins' claim that "the United States took their contract to sell the [subject] property."  Def.'s Mot. at 39. The government bases this request on the ground that the Katzins' have failed to "produce[] evidence to show that the United States took the contract by appropriating it or by acquiring its benefits or the right to enforce it, as they must to state a claim for a taking of a contract."  Def.'s Reply at 16.  The land sale contract was an executory contract, which disappeared on June 28, 2006.  Given that the only claim in this lawsuit is one for an interference of property rights that inhere as a result of Puerto Rican law, *see supra*, at 10 n.14, it is not necessary for the court to reach a decision as to whether the Katzins' claim for a taking of its rights under the terminated land-sale contract fails as a matter of law.