# In the United States Court of Federal Claims

No. 12-384L

(Filed: July 15, 2016)

| | |
|---|---|
| RICHARD LEWIS KATZIN, et al., | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) ) |
| UNITED STATES, | ) ) |
| Defendant. | ) ) ) |

Post-trial decision, alleged taking of a parcel of land on Culebra Island, Puerto Rico; standards for taking; ownership of property under Puerto Rican law; the government's claims of ownership; interference with and appropriation of plaintiffs' property interests; measure of just compensation

*Roberto E. Berríos Falcón*, San Juan, Puerto Rico for plaintiffs.  With Mr. Berríos during the trial and on the briefs were Roger J. Marzulla and Ian F. Gaunt, Marzulla Law, LLC, Washington, D.C.  Also with him on the briefs was Nancie G. Marzulla, Marzulla Law, LLC, Washington, D.C.

*Emily M. Meeker*, Environment and Natural Resources Division, United States Department of Justice, Washington, D.C., for defendant.  With Ms. Meeker during the trial and on the briefs were William J. Shapiro and Cullen S. Shearburn, Environment and Natural Resources Division, United States Department of Justice, Washington, D.C.  Also with her on the briefs was John C. Cruden, Assistant Attorney General, Environment and Natural Resources Division, United States Department of Justice, Washington, D.C.

## OPINION AND ORDER

LETTOW, Judge.

This post-trial opinion addresses claims by plaintiffs Dr. Richard Lewis Katzin ("Dr. Katzin"), Mary Beth Katzin Simon ("Ms. Katzin"), and Rose Marie Kjeldsen Winters ("Ms. Winters") that the United States (the "government") interfered with their ownership rights to a parcel of land ("Parcel 4") which overlooks the Atlantic Ocean on Culebra Island, Puerto Rico, and that the interference effected a taking in contravention of the Fifth Amendment.  In 2006, plaintiffs retained a real estate broker to sell the parcel and entered into an agreement of sale with a buyer.  A representative of the United States Fish & Wildlife Service ("FWS"), however, informed the buyer that FWS owned a strip of land along the coast of Parcel 4, an approximately 2.25-acre former gun mount site on a peninsula within Parcel 4, and the peninsula itself.  Plaintiffs allege that the FWS's claim of competing ownership caused the buyer to rescind the contract.  They also assert that since then FWS's continuing claim of ownership to the entire 10.01-acre peninsula on the eastern side of the property has prevented them from selling Parcel 4.

This case raises factual questions of property ownership that turn "in large part on events and handwritten records spanning the 19th and 20th centuries," beginning when Culebra was a possession of the Kingdom of Spain. *Katzin v. United States*, 120 Fed. Cl. 199, 201 (2015).  The government asserts that plaintiffs' claims are barred by the six-year statute of limitations set out in 28 U.S.C. § 2501 because the United States has claimed ownership of the coastal strip and the former gun mount site for many decades, and plaintiffs knew or should have known about these claims.  Def.'s Post-Trial Br. at 48-57, ECF No. 131.  Alternatively, the government asserts that plaintiffs' claims should be barred by the equitable doctrine of laches, arguing that plaintiffs' delay in bringing these claims before this court caused undue prejudice or injury to the United States.  *Id.* at 57-62.  Finally, the government asserts that plaintiffs have failed to establish that they own the peninsula on which a part of the former gun mount site and coastal strip are located, and that, in any event, the government's claims of ownership did not effect a taking of plaintiffs' property interests.  *Id.* at 62-98.  A nine-day trial was held in Washington, D.C. and San Juan, Puerto Rico, commencing on November 12, 2015, and ending on November 24, 2015.  Following post-trial briefing, a closing argument was held on March 31, 2016.  The case is now ready for disposition.

## FACTS[1]

### A.  *History of Property Interests on Culebra*

Culebra is an archipelago of islands approximately seventeen miles east of the island of Puerto Rico and twelve miles west of St. Thomas.  *Katzin*, 120 Fed. Cl. at 201-02; PX 421 at 3 (Expert Report of Awilda Rosa Santiago, "A Brief History of the Settlement of Culebra").[2]  The largest island, also named Culebra, is approximately 7 miles long and 3.5 miles wide with low hills and "a variety of tropical flora and fauna," including protected mangroves, coral reefs, sea birds, and sea turtles.  *Katzin*, 120 Fed. Cl. at 202; DX 1 at 11-12 (Report of the Puerto Rico Planning Board, "Culebra: A Plan for Conservation and Development" (Oct. 1973)).  Culebra is known for its beautiful beaches and natural harbors, but its climate is generally dry and fresh water is limited.  PX 412 at 3; DX 1 at 11-12.  The climate is also very mild, with temperatures rarely rising above the high eighties or falling below the low seventies.  DX 1 at 11.  The majority of the land on the large island is volcanically derived and contains shallow soils "not suitable for extensive cultivation."  *Id.*  Culebra's eastern or windward side faces the Atlantic Ocean, and the Atlantic meets the Caribbean Sea at the waters adjacent to Culebra.

1.  *Development of Culebra and division of property interests between the Kingdom of Spain and private owners.*

---

[1]The recitation of facts constitutes the court's principal findings of fact in accord with Rule 52(a) of the Rules of the Court of Federal Claims ("RCFC").  Other findings of fact and rulings on mixed questions of fact and law are set out in the analysis.

[2]Citations to plaintiffs' exhibits are identified as "PX __," and defendant's exhibits are identified as "DX __."  The parties have provided agreed translations into English of documents and exhibits written in Spanish, and those translations are designated with a "T," *e.g.*, "PX 2T."  The parties have also provided agreed translations into English of judicial decisions rendered in Spanish, and where the court has relied on the translation, that circumstance is noted in a parenthetical phrase following the citation to the decision.

Puerto Rico, including Culebra, was controlled by the Spanish crown until 1898. *Katzin*, 120 Fed. Cl. at 202 n.6; PX 412 at 3. Europeans did not live permanently on Culebra until the late 1800s, in part because of the limited availability of fresh water and because the islands' natural harbors were frequently used by pirates. DX 1 at 6; DX 49 at 56 (FWS Annual Narrative Report for Calendar Year 1994, Culebra National Wildlife Refuge). Several individuals petitioned the Spanish government in 1871 and 1874 to allow them to settle on Culebra, but the government denied these requests. DX 1 at 6. Shortly thereafter, however, in 1879, Spain announced that it would encourage settlement on Culebra, and the first settlers arrived the following year. *Id.* By 1899, Culebra had 704 residents. *Id.*

While Culebra was under Spanish control, property ownership on the island was subject to Spanish law. Under the Spanish Water Act of 1866, the following areas were considered public domain: (1) the "coasts, or sea boundaries of the Spanish territory, with their works, inlets, coves, roadsteads, bays and harbors, (2) the "maritime zone which encircles all the coasts," as defined by international law, and (3) the beaches, including the land "washed by the sea in its ebb and flow." Pls.' Post-Trial Br. at 6, ECF No. 130 (quoting *Armstrong v. Estado Libre Asociado de Puerto Rico*, 97 P.R. Dec. 588, 618 (1969) (translated from Spanish)). The mangrove marshes along the coasts of many islands, including Culebra, were also considered public domain. *Id.* The Ports Act of 1880 clarified the Water Act of 1866 by defining the "maritime terrestrial zone" as "the area of the coasts or seashore . . . that is washed by the sea in its ebb and flow, where the tide is perceptible, or the highest tidal waves in stormy weather when the tide is not perceptible." *Id.* at 7 (quoting *Armstrong*, 97 P.R. Dec. at 623 (translated from Spanish)). It further provided that land bounded by the ocean was subject to a "rescue and littoral" easement extending an additional 20 meters inland beyond the "maritime terrestrial zone," to be used in the event of a shipwreck. *Id.*

In 1887, the Kingdom of Spain commissioned a survey by Ramon Garcia Saenz to divide Culebra into lots to be assigned to private landowners. PX 421 at 3; Tr. 643:6-8, 662:16-19 (Test. of Prof. Awilda Rosa Santiago, Univ. of Puerto Rico); PX 2T (Survey Plan Regarding the Island of Culebra and Its Division into Lots, 1887).[3] The resulting survey plan divided the island into 80 lots, the majority of which were 25 hectares (approximately 62 acres)[4] in total area, to be assigned to individuals who would gain ownership of the property once they had demonstrated they had undertaken efforts to cultivate the land. Tr. 663:12-18 (Rosa); PX 3T at 4-8 (Parcel Division of the Island of Culebra); DX 1 at 24-25. The plan also included four "small adjacent islets," three of which were unoccupied and one which appears to have been settled. PX 3T at 12. Spain retained control over the remainder of the land on Culebra. Of that remainder, Lots 85-89 were designated as mangrove swamps (approximately 35 hectares in total), Lots 90-92 were designated as "lands reserved for the state" (approximately 466 hectares in total), 4.90 hectares of land were reserved "for the War Branch," 18.90 hectares were reserved "for the Town," approximately 26.5 hectares comprised Flamencos Lagoon, 1.80 hectares comprised Los Patos Lagoon, and 134.0 hectares were designated as a "maritime zone." *Id.*; PX 421 at 3. The

_____

[3] Citations to the trial transcript are to "Tr. __."

[4] Land areas on Culebra are alternatively referred to in terms of acres, hectares, and cuerdas. An acre is equivalent to 43,560 square feet of land, and a hectare is equivalent to approximately 2.5 acres (or approximately 107,639 square feet of land). A cuerda is a Puerto Rican land measurement (also referred to as a "Spanish acre") that is equivalent to approximately 0.971 acre (or approximately 42,300 square feet of land). Tr. 385:3-12 (Wagner).

134-hectare maritime zone does not appear to be labelled as such on the survey plan.  However, a thin strip of land is demarcated along most of the coast of the island, separated from the other 25-hectare, privately owned lots and in some places appearing to join with other Spanish-retained lots on the island, including mangrove swamps and Lots 90-92 (reserved for the state). PX 2T.

The subject property in this case (Parcel 4) roughly corresponds to the area designated as Lot 24 on the 1887 survey plan, although the size of Lot 24 is listed as 25 hectares (approximately 63.6 cuerdas) and Parcel 4 is approximately 67.5 cuerdas.  Tr. 665:3-6 (Rosa); PX 3T at 6; DX 28T at 9-10 (Deed of Division, Allocation, Transfer, and Delivery of Estate Property, Dec. 26, 1967).  On the survey plan, Lot 24 is bordered to the north by Lot 25, to the west by Lot 22, and to the south by Lot 23.  PX 2T.  The thin strip of separately demarcated land depicted along most of the island also runs along the eastern coast of Lot 24, which includes a small peninsula.  *Id.*  Lot 89 – a mangrove swamp comprised of 3.70 hectares (9.14 acres) – is labeled as such in an area within the thin strip of coastal land to the south of Lot 33 and to the northeast of Lot 24, across the bay called "Puerto del Manglar" (Mangrove Port).  *Id.*; PX 3T at 12.



PX 2 (inset of 1887 survey plan depicting Lot 24 and surrounding area).

2.   *Changes to property interests when Puerto Rico became a United States territory.*

In December 1898, the United States and the Kingdom of Spain signed a peace treaty known as the Treaty of Paris at the end of the Spanish-American War.  Treaty of Peace Between the United States of America and the Kingdom of Spain, Spain-U.S., Dec. 10, 1898, 30 Stat. 1754.  Among other things, the treaty ceded to the United States "the island of P[ue]rto Rico and other islands now under Spanish sovereignty in the West Indies."  *Id.* art. II.  The treaty also ceded ownership of all "buildings, wharves, barracks, forts, structures, public highways and other immovable property" in the public domain, but provided that this cession would not impair the property rights of individuals or "associations having legal capacity to acquire and possess property."  *Id.* art. VIII.  As a result of the treaty, the United States gained control of the maritime zone in Culebra, as described under Spanish law, as well as the lands reserved for Spain on the 1887 survey plan such as the mangrove swamps.

In 1900, the U.S. Congress passed the Foraker Act, which established a civil government in Puerto Rico and declared that all U.S. federal laws were in effect in Puerto Rico.  Act of Apr. 12, 1900, Pub. L. 56-191, 31 Stat. 77, 77-86.  The Foraker Act also provided that all property in Puerto Rico acquired by the United States through the Treaty of Paris would be "placed under the control of" the new Puerto Rican civil government.  *Id.* § 13.  In December 1901, President Roosevelt issued a general order stating that all public lands on Culebra were "placed under the jurisdiction and control of the Navy Department."  DX 4 (General Order No. 75).  President Roosevelt later made a proclamation confirming that public lands on Culebra were reserved for naval purposes.  DX 5 (Proclamation No. 4, 33 Stat. 2314 (June 26, 1903)).

In May 1902, Escolástico Mulero, who had gained title to Lots 24 and 25 after their initial partition in 1888, registered these lots with the Registry of Property of Puerto Rico, where they were designated as Property Numbers 55 and 28, respectively.  PX 407 (Registry of Property Entry for Lot 24/Property No. 55); PX 420 at 11 (Dennis D. Martinez, Opinion of Land Title Regarding Property Located in Culebra); Tr. 772: 24 to 773:15, 825:7-23 (Test. of Dennis D. Martinez Colón) (describing the adjudication of Lot 24/Property No. 55 and Lot 25/Property No. 28).[5]  Lot 24 was described in the registry as bounded on the north by Lot 25, on the south by Lot 23, on the east by the ocean, and on the west by Lot 22.  PX 420 at 11.  Lot 25 was

---

[5]The Puerto Rican Registry of Property provides certain procedures and protections that are distinct from other property registries in the United States.  *See* PX 420 at 2-10.  It is based on the Latin Notary system, in which one impartial legal counsel (the notary) represents all parties to a property transaction, prepares the relevant legal documents, and maintains the records of those documents during his or her lifetime.  *Id.* at 2-3.  Under Puerto Rican law, an "escritura pública" (authentic act, or document prepared by and signed before a notary) is a public document that is "considered to be true and legal."  *Id.* at 4 (citing P.R. Laws Ann. tit. 4, § 2002; *id.* tit. 31, § 3273).  For legal purposes, whoever wishes to contest the contents of an "escritura pública" has the burden of proof.  *Id.*  In real property transactions, a certified copy of the "escritura pública" must be filed in the Registry of Property.  *Id.* at 8.  At that point, the document receives the pertinent protection under Puerto Rican law, including the presumption that the property owner of record is in possession of the property, as well as protection for third parties relying on a document in the Registry of Property against future challenges.  *Id.* at 8-9 (citing P.R. Laws Ann. tit. 30, § 2355; *id.* tit. 31, § 1872).

described as bounded on the north by Lot 26 (owned by Antonio Lugo), on the south by Lot 24, on the east by the ocean, and on the west with Lot 21.

Mr. Mulero later registered other property he owned on Culebra, which included Lots 21 and 23 from the 1887 plan, as well as half of Lot 74 (bordering Lot 23 to the west) and Lot 75 (bordering Lot 23 to the south). PX 420 at 11-12; Pls.' Post-Trial Br. App. A, at 6 (summarizing properties owned by Mr. Mulero and their corresponding entries in the registry). In April 1903, Mr. Mulero executed a Deed of Grouping which combined all of his property on Culebra into one property, designated as Property No. 117 ("Buena Vista") in the Registry of Property. PX 410T at 4-6 (Registry of Property Entry for Property No. 117); Tr. 773:16 to 774:5 (Martinez). The Buena Vista tract was described in the deed as comprised of 346.5 cuerdas (137.5 hectares) bounded on the south and east by the ocean, on the north by property owned by Antonio Lugo, and on the west by property owned by Francisco Garcia. PX 410T at 5.

### 3. *Transfer of property from Escolástico Mulero to the United States Navy.*

On June 28, 1903, a representative of the Navy, David Chadwick, signed a deed of sale to purchase tracts of land on Culebra from two married couples: Mr. Mulero and his wife, and Demetria Felix Guadalupe and her husband. PX 12T (Deed of Sale No. 130). Mr. Chadwick, Mr. Mulero, and the Guadalupes met with a notary and a translator at Camp Roosevelt to sign the deed. *Id.* at 2-3. Mr. Chadwick did not know Spanish and the notary did not know English. *Id.* at 3. In addition, Mr. Mulero could not read or write Spanish, nor did he know English, and his wife could not see. *Id.* at 11. As a result, the deed indicated that Ricardo Amado was appointed by the Muleros to "verify" its contents. *Id.*

The description of Mr. Mulero's land (Buena Vista or Property No. 117) in the deed was consistent with, but not identical to, the description in the Deed of Grouping from May 1902. *Compare* PX 12T at 3-4, *with* PX 410T at 4. The deed described the land being purchased by the Navy as a 2.25-acre tract bounded on the north by property owned by Antonio Lugo and the ocean at one end, on the east by the ocean, and on the south and west by Property No. 117 from which the tract was segregated. PX 12T at 4-5. The deed did not identify a lot or property number within Property No. 117 where the 2.25-acre tract was located. However, based on this description, the 2.25-acre tract would be located at the northeast corner of Property No. 117, within the boundaries of the former Lot 25. The deed also recited a series of "bearings" outlining the perimeter of the tract based on the location of a "cannon emplacement mounted on the North side of" the tract, but it provided no further information on the location of the cannon emplacement, and this emplacement has not been located by the government or the Katzins. *Id.* at 5; Tr. 208:8 to 211:6 (Test. of Dr. Richard Lewis Katzin) (discussing unsuccessful efforts by the Katzins and FWS to locate the emplacement). The deed specified that the two tracts purchased from the Guadalupes were located within Lot 73 from the original 1887 survey plan. PX 12T at 5. Lot 73 apparently had not been grouped with other properties or otherwise changed since its original adjudication, since it was described in the deed as being 25 square hectares and bordered on the north by Lot 72 and on the east by Lot 10, consistent with the 1887 survey plan. *Id.*; PX 2T.

The deed was signed by the notary, Antonio de Aldrey, on June 28, 1903, a Sunday, and it was recorded at the Notary Office and the Property Registry the following day. PX 12T at 12; PX 411T (Registry of Property Entry for Property No. 120). Like the deed, the property registry

entry for the 2.25-acre tract (designated as Property No. 120) described it as "bounded to the North by [property owned by] Mr. Antonio Lugo and the sea on a tip of land; to the East by the sea; and to the South and West by the main property from which it is segregated." PX 411T at 4. The property registry record referenced a deed signed on June 28th at Camp Roosevelt; it did not refer to any other written agreement between the parties. *Id.* at 5.

Mr. Chadwick and Mr. Mulero also ostensibly signed an "Agreement of Sale" on June 29, 1903, a day after the deed was signed, describing the sale of the 2.25-acre tract of land to the Navy. DX 42 (Agreement of Sale). The agreement contains a similar metes description of the 2.25-acre tract, but specifies that it is located in "Plot Number 24, Official Chart of Culebra, U.S.W.I.," presumably referring to Lot 24 from the 1887 survey plan. *Id.* at 1. Unlike the deed, the agreement of sale was written in English only and it did not indicate that anyone was present to read, translate, or otherwise verify the contents on Mr. Mulero's behalf. The agreement and the deed have similar stamps with the year 1903, but the notary who signed the deed (Antonio de Aldrey) did not sign the agreement of sale. *Id.* at 2.[6] Mr. Mulero's name is written in script in the signature block of the agreement, below the handwritten word "His" and above the handwritten word "Mark," with a cross or plus sign between the words "Escolastico" and "Mulero." *Id.*

4. *Further segregation and sale of Mr. Mulero's property.*

Mr. Mulero died in May 1904, and his widow, Tomasa Rivera, registered Property No. 117 as community property in the name of herself, her children, and her grandchildren in accordance with Mr. Mulero's will. PX 410T at 9-11. Ms. Rivera and the other heirs segregated 300.5 cuerdas (approximately 117 hectares) from Property No. 117 and sold the segregated property (Property No. 167) in October 1909 to Enrique Bird Arias. PX 412T at 4-6 (Property Registry Entry for Property No. 167). The property registry entry noted that Property No. 117, from which Property No. 167 was being segregated, was 344.25 cuerdas in total, which reflects the sale of 2.25 acres to the Navy the previous year. *Id.* at 4. Property No. 167 was described as bounded on the north by the property of Antonio Lugo; on the south by the property of Jose Navarro, the ocean, and Property No. 117; on the east by the ocean and land owned by the U.S. Navy; and on the west by the property of Francisco Garcia. *Id.* This description places former Lot 24 within Property No. 167.

In 1914, Mr. Bird Arias sold Property No. 167 to a commercial partnership (Mercantil de Fajardo, Hijos de J. Bird León), of which he and his brother Arturo Bird Arias were the only partners. PX 412 at 10. Arturo Bird Arias died in 1917 and his widow sold her interest in the partnership to Enrique Bird Arias. *Id.* at 12-14. After Enrique Bird Arias died in 1919, his widow separated Property No. 167 from the partnership and registered it in the name of herself and Enrique's heirs. *Id.* at 18-19. In 1923, Property No. 167 fell into receivership and was sold at auction to Charles W. Fowler. *Id.* at 27-28. Mr. Fowler sold the property the following year to The Vieques Association in New York. *Id.* at 29-34. It was then consolidated with other property on Culebra owned by the Association and became tract number 6 of Property No. 228. *Id.* at 35; PX 413T at 6-7 (Property Registry Entry for Property No. 228). The description of tract 6 in the property registry entry matches the description of Property No. 167, including that

---

[6]There is one illegible witness signature at the bottom of the agreement of sale, but the witness's name does not match any of the parties or witnesses described in the deed. DX 42 at 2.

it was bordered on the east, in part, by property of the U.S. Navy.  *Compare* PX 413T at 7, *with* PX 412T at 4.  In 1928, Property No. 228 was sold to the United Porto Rico Sugar Company and consolidated with other property to form Property No. 249.  PX 413T at 22-24; PX 415T at 4 (Property Registry Entry for Property No. 270).  Property No. 167 became tract number 76 of Property No. 249.  PX 415T at 4.  Property No. 249 was sold at auction in 1934 to the trustees of the Eastern Sugar Associates.  *Id.*

     5.  *Plaintiffs' acquisition of interests in the subject property.*

In 1940, the Eastern Sugar Associates trust segregated tract 76 from Property No. 249 and sold it to Pilar Gonzalez Alhoyo.  PX 415T at 4-7, 11.  Tract 76 became Property No. 270, with the same boundary description as the original Property No. 167: bounded on the north by the property of Antonio Lugo; on the south with property of Jose Navarro, the ocean, and the property from which it was segregated; on the east with the ocean and lands of the U.S. Navy; and on the west with the property of Francisco Garcia.  *Id.* at 4.  When Mr. Gonzalez died in 1963, Property No. 270 passed to his heirs, including two of his granddaughters, Ms. Winters and her sister, Luz Kjeldsen McLaughlin.  *Id.* at 11-14.

Mr. Gonzalez's heirs hired a surveyor, Alfredo Quiñones Clemente, to survey Property No. 270 in order to subdivide it among the heirs.  DX 28T; DX 29T (Stadia Survey Plat, Alfredo Quiñones Clemente); Tr. 29:15 to 52:7 (Test. of Ms. Winters).  Ms. Winters had a copy of the Quiñones survey in her possession at the time the present case was filed.  Tr. 51:25 to 52:7 (Winters).  The survey plat appears to include two separate boundary lines around the property, the first (outer boundary) consisting of points numbered 1-69, and the second (inner boundary) consisting of points with the letters A to Z, $A^1$ to $Z^1$, and roman numerals I to XXX (for a total of 82 points).  DX 29T.  The plat does not explain why there are two separate boundaries or how they were derived, but the total area of the property was calculated using the points from the outer boundary.  *Id.*  This calculation determined that Property No. 270 consisted of 344.6254 cuerdas, which is larger than the size described in the deed for Property No. 270 when it was re-segregated from Property No. 249 in 1940 (300.5 cuerdas).  *Compare* DX 29T *with* PX 415T at 4.  The survey plat also depicted various contour lines along the coast of the property.  DX 29T.

The Quiñones survey's depiction of Property No. 270 did not include the peninsula to the east of former Lot 24.  DX 29T.  Instead, there is a straight boundary line between points 26 and 27 of the outer boundary that excludes the peninsula.  *Id.*  There is also a break in the coastal contour lines in the area where the peninsula would be located.  *Id.*  Neither the outer boundary nor the inner boundary appears to reach the coastline of the property, leaving a thin coastal strip around the property.  *Id.*  The seaward side of this strip is annotated with markings such as "mangrove," "bayahonda tree," and "almacigo tree."  *Id.*  On one tip of land on the southeastern side of the property, consistent with former Lot 76 on the 1887 survey plan and next to the label "Pta. del Viento," the coastal strip is labeled "Navy."  *Id.*



DX 29T (inset).

Another surveyor, José Gómez Velázquez, was hired to prepare a subdivision plan for the property based on the Quiñones survey.  DX 30T (Subdivision Plat, José M. Gómez Velázquez); Tr. 52:21 to 54:7 (Winters).  The subdivision plat uses the outer boundary line of the Quiñones survey, with points numbered 1-69.  DX 30T.  The plat shows the Pilar Gonzalez property divided into five parcels (numbered Parcels 2-6) of approximately 67.5 cuerdas each, plus a small lot in the middle (Parcel 1) consisting of approximately 2.88 cuerdas of "common land."  *Id.*  Parcel 4 roughly corresponds to the location of former Lot 24 from the 1887 survey plan, but

like the Quiñones survey, it does not encompass the peninsula along its eastern border.  DX 30T.[7]



DX 30T (inset).

The Pilar Gonzalez property was partitioned in 1967 through a deed executed before a notary (Deed No. 4).  DX 28T.  The description for each of the six parcels stated the size of the

---

[7]A subsequent land study commissioned by the government in 2014 determined that the area depicted for Parcel 4 in the Gómez survey was 67.5034 cuerdas.  DX 31 at 5; Tr. 1368:19 to 1369:10 (Test. of Javier E. Bidot Cruz).  This measurement did not include the peninsula to the east of the area depicted.  The size of the peninsula was determined to be approximately 15 cuerdas, not inclusive of the mangroves growing along the tidal areas of the property.  Tr. 1371:7-14, 1373:7 to 1377:19 (Bidot).

parcel "pursuant to the survey performed by engineer José M. Gómez Velázquez." *Id.* at 9-10. Ms. Winters was one of the signatories to the deed. Tr. 41:19 to 42:20 (Winters) (discussing PX 51, which is the same document contained in DX 28 and DX 28T). Although prior to the subdivision, the property registry record for the Pilar Gonzalez property (Property No. 270) indicated it was bounded on the east by the ocean and property of the U.S. Navy, PX 415T at 4, none of the descriptions of the partitioned parcels in the deed mention a border with U.S. Navy lands, DX 28T at 9-10. The lot designated as Parcel 4 was the lot allocated to Ms. Winters and Luz Kjeldsen McLaughlin as their inheritance from the estate of Pilar Gonzalez. DX 28T at 11; Tr. 41:19-24 (Winters). Parcel 4 was described in the deed as 67.5034 cuerdas bounded on the north with Parcel 5, on the south by Parcels 1 and 3, on the east by the ocean, and on the west with Parcels 1 and 6. DX 28T at 9-10. Parcel 4 was recorded in the property registry as Property No. 340, with the same size and boundary descriptions as contained in the deed of partition. PX 416T at 4-6 (Property Registry Entry for Property No. 340).

After the partition of Parcel 4 in 1967, Ms. Winters paid property taxes to Puerto Rico's Municipal Tax Collection Office ("CRIM") based on a property size of 33.75 cuerdas, which corresponded to her 50% ownership of the parcel. DX 352T (CRIM Notification and Demand for Payment of Real Property Tax, Jan. 1, 2003); Tr. 82:16 to 86:13 (Winters). CRIM keeps records of cadaster maps showing the parcels being taxed, along with their corresponding tax identification numbers. Tr. 617:3-17 (Test. of Augusto Fidel Gandía Ojeda). The CRIM cadaster maps from 1978, 2000, and 2013 show Parcel 4 (tax identification number 476-000-005-01) similar to how it was depicted in the Quiñones survey, although its eastern border appears to extend further into the peninsula. DX 61T (CRIM Map for Appraisers No. 476) (last updated May 19, 2000); DX 62T (CRIM Map for Appraisers No. 476) (stamped July 22, 1978); DX 303T (CRIM Cadaster Map No. 476) (date of printing Apr. 16, 2013).[8] However, all three cadaster maps show a separate parcel of land on the peninsula to the east of Parcel 4, with a separate tax identification number (476-000-005-02). DX 61T; DX 62T; DX 303T. On the cadaster map from 2000, the word "Navy" is written in the peninsula area; there is no such label on the other two maps. DX 61T. The 1951 appraisal card for the parcel on the peninsula identifies the occupant of the parcel as "U.S. Navy," and indicates that the parcel is "exempt" from appraisal. DX 37T at 2, 4. The CRIM cadaster maps also appear to depict a thin strip of land along the coast that is separated from the parcels with tax identification numbers. DX 61T; DX 62T; DX 303T.

---

[8]The 2000 and 2013 maps also depict an extension of the northern border of Parcel 4 into what would have been Parcel 5 in the Quiñones survey. DX 61T; DX 303T.



DX 61T (inset of the 2000 cadaster map).

      In 1971, Harry Grayson, Herbert Katzin, and Annette Katzin purchased Luz Kjeldsen McLaughlin's 50% interest in Parcel 4.  PX 416 at 6-9.  As a result of this purchase, Mr. Grayson owned a 25% interest in Parcel 4, the Katzins together owned a 25% interest, and Ms. Winters owned a 50% interest.  *Id.* at 6-7.  Contemporaneously, Mr. Grayson and the Katzins jointly purchased Parcels 2 and 3, which covered the southern part of the property previously owned by Pilar Gonzalez.  Tr. 1222:25 to 1223:8 (Test. of Ernesto A. Meléndez Perez).  Mr. Grayson and the Katzins hired an attorney, Ernesto A. Meléndez Perez, and a surveyor, Fred Fletcher, to help them further subdivide Parcels 2 and 3 into smaller lots so that they could be sold and developed for residential purposes.  Tr. 1229:15 to 1233:4 (Meléndez).  In 1974, Parcels 2 and 3 were first grouped into one large parcel of approximately 135 cuerdas and then subdivided into 24 smaller lots of approximately five cuerdas each.  DX 205 at 1 (Letter from

Meléndez to Jerry Vits, U.S. Fish & Wildlife Service, May 30, 1987); Tr. 1231:18 to 1233:4 (Meléndez). [9]  As part of this effort, Mr. Meléndez requested from the mayor of Culebra a copy of Navy Works Map 323 from 1945, which among other things showed a "gun emplacement" on the tip of the peninsula of former Lot 24.  DX 39T (Letter from Meléndez to the Hon. Ramón Feliciano, Mayor of Culebra); DX 79T (Navy Works Map 323).  Herbert Katzin gave a copy of this Navy map to Ms. Katzin at some point before his death.  Tr. 172:8 to 173:7 (Test. of Ms. Katzin).

Mr. Fletcher also surveyed Parcel 4 for the purpose dividing it in half, with Ms. Winters' property to the north and the property jointly owned by Mr. Grayson and the Katzins to the south.  DX 32 (Letter from Grayson to Fletcher, Mar. 30, 1973); PX 422 at 5 (Surveyor's Report, Benigno Rodríguez Burgos); Tr. 1233:5-8 (Meléndez).  Mr. Grayson provided Mr. Fletcher a prior survey of Parcel 4, noting that "[t]he problem is that the east boundary of the existing survey does not follow the contour of the coastline exactly as it should, since the deed reads that the property is bounded by the water."  DX 32.  Mr. Grayson also stated:

> We have seen Navy maps indicating that the Navy lays no claim to this property beyond the standard maritime zone and legal counsel tells us that there should be no problem in that direction. . . . [Parcel] #4 is currently owned by my partner [Dr. Katzin] and myself jointly with Mrs. Rosemary Winters of Suffern, N.Y. When it is divided, Mrs. Winters has agreed to take the *north* half and we will take the south half so that our holding will be contiguous with the rest of our farm [Parcels 2 and 3].  But it is *absolutely essential* that the amount of actual coastline as well as the amount of acreage behind it be *exactly equal*.  We also feel that a final *true* survey will yield somewhat more than a total of 67.5 cuerdas.

DX 32 (emphasis in original).

Unlike the Quiñones and Gómez surveys, the Fletcher survey depicts a peninsula to the east of Parcel 4.  PX 422T at 5.  The survey also reports the size of Parcel 4 as 70.8598 cuerdas, which is approximately 3.3 cuerdas larger than the size reported in the deed of partition and the property registry entry for Property No. 340.  *Compare id. with* DX 28T at 9-10 *and* PX 416T at 4.  When Mr. Fletcher produced the new survey in 1974, he noted next to his signature that the "property line [was] taken as shown by Mr. Harry Grayson."  PX 422 at 5.  Mr. Grayson and the Katzins wrote to Mr. Fletcher in September 1974 to say they were "very much disturbed" about this statement in the survey legend.  DX 35 (Letter from Mr. Grayson and the Katzins to Mr. Fletcher (Sept. 2, 1974)).  The owners also noted that it appeared that Mr. Fletcher had "erased and replaced" a line leading to point 64, which appears at the southeast corner of the property. *Id.*  The letter stated that Ms. Winters would not agree to the parcel division and the owners would not pay Mr. Fletcher in full until these changes were made.  *Id.*  Annette Katzin sent another letter to Mr. Fletcher in November 1974 reiterating these concerns and asking him to change the legend to state that the boundary lines were derived from the Gómez survey.  DX 36 (Letter from Annette Katzin to Fletcher (Nov. 17, 1974)).  Despite these objections, it does not appear that the legend on the Fletcher survey was changed.  The subdivision of Parcel 4 was not

---

[9]These 24 lots later became known as "Punta del Viento Estates."  *See, e.g.*, DX 51 at 5 (conservation easement agreement for the seaside portion of the lots formerly comprising Parcels 2 and 3).

completed, and the zoning law was later changed so that Parcel 4 was considered "very low-density," meaning that it could not be developed in parcels of less than 25 cuerdas.  Tr. 1429:6-20 (Test. of Jose Dapena Iglesias); Tr. 480:3-23 (Test. of Sandra E. Wagner); Tr. 1231:25 to 1233:6 (Meléndez);



PX 422 at 5 (inset of Fletcher survey).

Herbert and Annette Katzin acquired Mr. Grayson's interest in Parcel 4 in 1978.  PX 416T at 9.  Herbert Katzin died in 1995, leaving his interest in Parcel 4 to Annette Katzin.  Am. Compl. ¶ 44.  In 2004, Annette Katzin transferred her interest in Parcel 4 to Ms. Katzin and Dr. Katzin.  DX 70 (Assignment of Property Interest, May 18, 2004).  As a result of these transfers, Ms. Katzin and Dr. Katzin own an undivided 50% interest in Parcel 4, and Ms. Winters owns the remaining 50% interest.

### B.  *U.S. Government Records of Properties on Culebra*

### 1.  *Records of properties controlled by the Navy.*

In 1936, the Navy's Judge Advocate General responded to an inquiry from the Department of the Interior's Division of Territories and Island Possessions about "the exact

portions" of property on Culebra "included within the Naval Reservation set apart by the President's Proclamation of June 23, 1903." PX 31 at 1 (Letter from Judge Advocate General of the Navy to the Department of the Interior (May 1, 1936)).  The letter indicated that among other properties, the United States had acquired four parcels of land on which "gun mount platforms were erected." *Id.*  This list included a 2.25-acre tract on "Lot 24" acquired from Mr. Mulero in 1903.  *Id.* at 2.  It also included a gun mount site on Lot 73 acquired from the Guadalupes at the same time.  *Id.*

In 1937, the Navy published a manual of real estate controlled by the Navy, including land on Culebra.  DX 6 (Dept. of the Navy, Federal[ly] Owned Real Estate Under the Control of the Navy Dept.).  It stated that the Navy had purchased certain properties to be used as gun mounts, including a 2.25-acre tract "in lot 24" acquired "from Escolastico" in 1903.  *Id.* at 314.  The manual also listed eleven lots (Lots 83-92 and a lot designated as "SW Cav") that were considered public lands reserved for naval purposes, totaling approximately 2400 acres.  *Id.* at 313.  A footnote to this list contained the following caveat:

> Extent of public lands within area set aside by foregoing Executive orders necessarily depends on amount of privately owned lands within said area at time it was acquired under [the Treaty of Paris].  Investigation of local records has not been completed, so the foregoing information concerning Culebra is necessarily tentative (Dec. 1, 1936).

*Id.* at 313 n.2.  The manual further stated that the public lands also included "a narrow strip of shore land running from the northeast corner of lot no. 90 on the north side of Culebra Island to lot no. 92 on the extreme south end of the island."  *Id.* at 314.  The manual's descriptions of Lots 90 and 92, as well as the narrow strip of land running along the coast between these two lots, are consistent with the properties depicted in the 1887 survey plan.  *Compare id.* at 314, with PX 2T (showing the locations of Lots 90 and 92 and a narrow strip of separately demarcated land along the eastern and southern coast of the island).  In other respects, however, the lot descriptions differ.  For example, the manual lists "Lot 89" as comprising 199.25 acres, whereas the 1887 survey plan indicates Lot 89 was a 3.7-hectare (9.14-acre) mangrove swamp.  *Compare* DX 6 at 313, *with* PX 3T at 12.

Separately, the U.S. Department of Interior's Puerto Rico Reconstruction Administration ("PRRA") prepared a survey map of Culebra in 1937.  DX 9 (Map of the Island of Culebra, Sept. 2, 1937).[10]  The map appears to depict lots within Culebra consistent with the lots on the 1887 survey plan.  *Compare* DX 9 *with* PX 2T.  The map's legend indicates that small numbered polygons within some of the lots "indicate[] gun mounts."  DX 9.  One such polygon, with the number 7 inside of it, is on the peninsula to the east of Lot 24.  Two similar polygons numbered 4 and 5 are in an area labelled Lot 73B, which corresponds to the southern portion of Lot 73 previously owned by the Guadalupes when they transferred two tracts to the Navy in 1903.

---

[10]The Puerto Rico Reconstruction Administration was established in May 1935 through Executive Order No. 7057, as part of the Emergency Relief Appropriation Act of 1935, Pub. L. 74-11, 49 Stat. 115 (1935).  It was created as an agency within the Department of the Interior "[t]o initiate, formulate and supervise a program of approved projects for providing relief and work relief and for increasing employment within Puerto Rico."  Exec. Order No. 7057 (1935).



DX 9 (inset).

  The Navy prepared another property graphic in 1947 showing three gun mount sites on Culebra.  DX 11 (Parcels Acquired for Gun Mounts by the U.S. Gov't).  The graphic showed an area of land marked "Parcel Buena Vista" and with the number 7 in the middle, which appeared to connect with Lot 24 on its northwest side, and which was labeled "Navarro Pt." on its southeast tip.  The southeast tip of the peninsula to the east of Lot 24 on the 1937 PRRA map was also labeled "Navarro Pt."  DX 9.  The 1947 graphic indicated that "Parcel Buena Vista" was 10.01 acres in size.  DX 11.  It also showed two points marking the corners of the border with Lot 24.  In the mid-1990s, a FWS representative, Billy Raspberry, observed a concrete marker at the location marked by the number 1 on the 1947 graphic.  Tr. 1096:23 to 1098:11 (Test. of Charles Leon McGee, U.S. Fish & Wildlife Service (retired)).  The concrete marker had "USN 1945" inscribed in the concrete and an iron bar running through the middle.  DX 10 (Picture of Concrete Monument); Tr. 1097:13-19 (McGee).  The two other properties included on the 1947 graphic were labelled "Parcel Madame Blanco" (number 4) and "Parcel Carenero" (number 5).  DX 11.  Both parcels appeared to fall within Lot 73B, the southern portion of Lot

73 previously owned by the Guadalupes.  *Compare* DX 11 *with* DX 9 (PRRA map) *and* PX 2T (1887 survey plan).

In 1968, the Navy produced another real estate map of Culebra.  DX 15 (U.S. Naval Station Roosevelt Roads, Culebra Island Real Estate Summary Map).  The map showed several properties on Culebra marked with the number 1, including areas consistent with Lots 81-92 from the 1887 survey plan, as well as a coastal strip of land running along the southern and eastern coast of the island also consistent with the strip of land depicted on the 1887 plan.  *Compare* DX 15, *with* PX 2T.  The map described these properties as a fee simple transfer of land through the Presidential Proclamation of 1903.  DX 15.  The map also showed an area of land within the peninsula to the east of Lot 24, marked with the number 6, as a 2.25-acre tract purchased through Deed No. 130 on June 28, 1903.  It showed four similar areas acquired via deed on or around the same date, including two tracts numbered 4 and 5 that are consistent with the tracts previously depicted in Lot 73 or 73B.



DX 15 (inset).

2.   *Transfer of certain interests from the Navy to the U.S. Fish and Wildlife Service.*

In 1971, the Senate Committee on Interior and Insular Affairs' directed the Secretary of the Interior to prepare a report on Culebra identifying "the highest and best use or mix of uses of the island's natural resources," with a view to establishing fish and wildlife refuges or recreational areas.  DX 13 (Resolution of the Sen. Comm. on Interior and Insular Affairs (June 16, 1971)).  In response, the Department of the Interior, in partnership with the Puerto Rico Department of Natural Resources and the Puerto Rico Planning Board, submitted a plan to the Senate Committee in October 1973.  DX 1.  The plan included a map indicating the "present status of federal land" on Culebra.  *Id.* at 22.  The map showed a strip of land along the eastern and southern coast of the island that was "recently excessed by the Navy," including some of the peninsula at the eastern side of Parcel 4.  *Id.*  The plan also noted that

> The holdings of private owners on Culebra . . . are based on deeds given after 1887 by the Crown [of Spain].  Although these deeds established some lot boundaries by reference to the 1887 survey map, they established others without explicit reference to the map.  This is frequently true of boundaries along the coast.  As a result, although there is no doubt that the Federal government owns the maritime-terrestrial zone, there is uncertainty about the landward boundary of the zone.  Navy claims are based on the 1887 map, but some private owners claim that their deeded holdings extend nearer to the sea th[a]n the boundary shown on that map.  Lawsuits raising the issue are currently pending before both Federal and Commonwealth courts.

*Id.* at 25.  As a result, the plan stated that "[t]itle and boundary disputes render any quantification of land ownership in Culebra uncertain," and it reported federal land ownership in terms of a "best available estimate."  *Id.* at 27.



*Id.* at 22.

Contemporaneously, the Secretary of Defense announced that all Navy operations on Culebra would end by July 1975. DX 1 at 2. In July 1972, the Navy prepared a report of excess real property listing real estate on Culebra that the Navy had no need to hold. DX 132 (Report of Excess Real Property, July 5, 1972). The excess property included approximately 252 acres "comprising 7 linear miles of coastline . . . extending from a point south of the northwest peninsula to the Navy's 'Camp' area," and another 294 acres "comprising 9.5 linear miles of coastline extending from the 'Camp' area around the eastern end of the island to the Navy's 'Observation' area." *Id.* at 1-2. The foregoing coastal areas were identified as part of "Tract 1" on the 1968 real estate map (DX 15). *Id.* at 2, 9. The excess property also included "five former gun mount sites" (13.83 acres total) identified on the 1968 map as Tracts 2-6. *Id.* at 1-2, 9-11. Tract 6 was described as approximately 2.25 acres in size comprising "a portion of the property identified as Lot No. 24 on the Official Chart of Culebra Island," and "bounded on the north, east and south by the seacoast and on the west by the principal plot from which it was segregated." *Id.* at 11.

In 1973, the U.S. Congress authorized funds for the relocation of Navy "ship-to-shore and other gun fire and bombing operations" from the northwest peninsula of Culebra. An Act to Authorize Certain Construction at Military Installations, Pub. L. No. 93-166, § 204, 87 Stat. 661 (1973). These funds were conditioned on the "conclusion of a satisfactory agreement to be negotiated by the Secretary of the Navy . . . with the Commonwealth of Puerto Rico" ensuring that the Navy was provided with an appropriate substitute location free of any activity that would interfere with these operations. *Id.* While this agreement between the Navy and Puerto Rico was being negotiated, Puerto Rico entered into annual license agreements to use Navy-controlled properties on Culebra in exchange for its agreement to "accept all responsibilities and obligations for the maintenance and protection of the properties." DX 17 at 4-12 (License Agreement Between the United States of America and the Commonwealth of Puerto Rico (Aug. 27, 1976)); DX 18 (License Agreement Between the United States of America and the Commonwealth of Puerto Rico (Nov. 7, 1979)); DX 155 at 3-10, 17-22 (License Agreement Between the United States of America and the Commonwealth of Puerto Rico (Nov. 7, 1981)). These license agreements included descriptions of twelve parcels purportedly owned by the U.S. government, using lot numbers based on the 1887 survey plan. *E.g.,* DX 17 at 5-10. The descriptions of Parcels 2, 8, 9, 10, 11, and 12 all indicated they were "coastal strips" along the island. *E.g., id.* at 6-9. Parcel 12 is described as a strip running from the southwestern corner of Lot 71 around the southern and eastern coast of the island to the northwestern corner of Lot 37, which would include the coastal strip to the east of Lot 24. *Id.* at 9. The agreements also included five tracts within Parcel 7 that are described as areas "formerly known as Gun Mounts," totaling 13.83 acres. *Id.* at 6. Tract 5 of Parcel 7 is described as approximately 2.25 acres in size, comprising a portion of Lot 24, and "bounded on the north, east and south by the seacoast and on the west by the principal plot from which is was segregated." *Id.* at 8. The agreements also contained a bearings description starting from the center of the purported gun mount, similar to the bearings description contained in the 1903 deed with Mr. Mulero, as well as the agreement of sale signed a day later. *Compare id.* at 8, *with* PX 12T at 5, *and* DX 42 at 1. A map attached as Exhibit A to the agreements depicted these properties on the island. DX 19 (Exhibit A to DX 17 (License NF(R)-33738 (Aug. 27, 1976)).



DX 19 (inset).

When the federal lands on Culebra were reported as "excess" by the Navy in 1972, the General Services Administration ("GSA") assumed responsibility for the disposition of these lands. DX 132; PX 110 (Memorandum from FWS Regional Director Regarding Meeting with GSA Concerning Culebra, Jan. 24, 1975). In 1975, the FWS applied for transfer of certain lands on Culebra, including "121.04 acres on the Island of Culebra." PX 110. GSA accepted this transfer application and directed that Navy Map No. 323 be used in conducting the transfer. *Id.* This map was based on the 1887 survey plan of Culebra and included a highlighted area denoting Navy ownership of a coastal strip around the southern and eastern coast of the island, including around the peninsula to the east of Lot 24. DX 40T (Navy Map 323). The map also included an annotation on the peninsula indicating a location for a gun emplacement. *Id.*

In March 1980, FWS sent a letter to the Director of GSA's Real Property Division providing "legal descriptions" of additional land that was to be transferred to the Commonwealth of Puerto Rico and to FWS. DX 254 (Letter from FWS Regional Director to Director, GSA Real Property Division (Mar. 7, 1980)). The transfer to FWS involved a total of 776.35 acres, described as tracts 1a, 1d, 1e, 1f, and 1j, which were to become part of the National Wildlife Refuge System. *Id.* at 1, 7-9. The description of tract 1e indicated that it was a coastal strip

running from the southwest corner of Lot 76, along the eastern boundary of Lots 23, 24, and 25, and on to the southeast corner of Lot 77, for a total of 53.78 acres. *Id.* at 9.[11]  The description of tract 1f indicated that it was a portion of Lot 24 of approximately 2.25 acres, consistent with the description of the former gun mount site in Tract 5 of Parcel 7 in the license agreements with Puerto Rico, and with a bearings description similar to the agreement of sale signed the day following execution of the 1903 deed with Mr. Mulero, and to some extent correlating to the bearings in the deed, although not to the lot location in that deed. *Compare id.* at 10, *with* DX 17 at 8, *and* PX 12T at 5, *and* DX 42 at 1.

That same month, in accordance with the National Environmental Policy Act, 42 U.S.C. §§ 4321-4370h, FWS published notice in the Federal Register that it would prepare a Draft Environmental Impact Statement on the disposition of excess Navy lands.  Intent to Prepare an Envt'l Impact Statement on the Proposed Disposition and Administration of Lands on the Islands of Culebra and Culebrita, 45 Fed. Reg. 16,358-01 (Fish & Wildlife Serv. (Mar. 13, 1980)).  FWS also advertised and held public meetings in Culebra and San Juan in April 1980 to discuss the proposed transfer.  *See* DX 20T (Public Hearings to Be Held Regarding the Transfer of Excess Federal Lands in Culebra (Apr. 5, 1980)).  Members of the public raised various issues during those meetings, including challenges to the U.S. government's title to certain property on Culebra.  *E.g., id.* at 20, 22 (minutes from the meeting in Culebra showing that residents questioned how FWS acquired the lands and noting that certain residents of Culebra had deeds showing title to these lands).  There is no record that the owners of Parcel 4 (at that time, Herbert Katzin, Annette Katzin, and Ms. Winters) attended either of these meetings.

FWS published the draft Environmental Impact Statement in December 1980, including a map of the property to be transferred.  DX 21 (Draft Environmental Impact Statement, (Dec. 1980)); *see also* Availability of Draft Envt'l Impact Statement, 45 Fed. Reg. 84,157-02 (Fish & Wildlife Serv. (Dec. 17, 1980)).  FWS published the final Environmental Impact Statement in October 1981; the final statement included the same property transfer map as in the draft.  DX 22 (Final Environmental Impact Statement (Oct. 1981)); Availability of Final Envt'l Impact Statement, 46 Fed. Reg. 50,421-01 (Fish & Wildlife Serv. (Oct. 13, 1981)).  The Record of Decision of the transfer of land to FWS was published in the *Federal Register* in March 1982. Record of Decision on Proposed Disposition and Administration of Lands Declared Excess by U.S. Navy on the Islands of Culebra and Culebrita in Puerto Rico, 47 Fed. Reg. 11,114-02 (Fish & Wildlife Serv. (Mar. 15, 1982)).  FWS accepted custody of the 776.35 acres of land, including Tracts 1e and 1f, shortly thereafter.  DX 149 (Letter from Regional Director, FWS to Acting Director, Real Estate Division, U.S. Naval Facilities Engineering Command (Mar. 25, 1982)). Tract 1e was defined according to the Spanish 1887 survey plan and consisted of a thin strip of land "beginning at the southwest corner of Lot 76" of that plan and extending to "the east boundary of lots 23, 24, 25, and 26, and the south boundary of lots 33, 34, and 77," etc.   DX 254 at 9 (capitalization omitted).  Tract 1f was defined as a 2.25 acre plot of lot 24 and referred to "the center of the gun mount located on the [n]orth side of said [l]ot [n]o. 24." *Id.* at 10.

---

[11]This description of tract 1e represents a portion of the coastal strip in Parcel 12 of the license agreements with Puerto Rico.  The remainder of Parcel 12 was represented by tract 1j (transferred to FWS) and tracts 1c and 1g (transferred to Puerto Rico).  DX 254 at 4-5, 10.



PX 288 at 4 (facsimile from John Beasley to Claudia Motta (June 22, 2006)).

      In 1985, FWS surveyed the property in its custody on the eastern coast of Culebra, referred to as the "Culebra National Wildlife Refuge." DX 152 at 7 (FWS Contract with E. Cividanes-Freiria & Associates (Mar. 29, 1985)); Tr. 1171:10 to 1177:4 (McGee). The survey contract included placement of permanent monuments, such as an "iron pipe or bar set in concrete," at the corners of the property. DX 152 at 8. The numbers of the monuments were reflected in the survey plat. DX 59 (Survey Plat, 1985); Tr. 1180:15 to 1181:19 (McGee). The completed survey plat included boundary lines for tracts 1e and 1f. DX 59. Tract 1f (the purported gun mount site) appeared to be bounded by points 606, 607, 609, 610, and 611. *Id.* Government representatives were able to locate some of the 1985 survey monuments in 2012 and 2013, several of which were accompanied by FWS signs indicating the boundary of a National Wildlife Refuge. DX 31 at 10 & Exs. 18, 29 (Expert Report of Javier E. Bidot); DX 263T (Picture of National Wildlife Refuge Sign). An FWS representative located a marker at point 606, but not the other four markers for tract 1f. DX 31 at 10.

3.  *Communication between the owners of Parcel 4 and FWS regarding property interests.*

In March 1987, an attorney, Edward Borges, wrote to the FWS Regional Director on behalf of Culebra Enterprises Corporation and Melvin Mailloux, owners of two contiguous parcels of land on Culebra north of Parcel 4.  DX 204 (Letter from Edward Borges to FWS Regional Director (Mar. 6, 1987)).  In his letter, Mr. Borges stated that while the boundary line in the 1985 FWS survey was based on the 1887 survey plan of Culebra, this boundary did not adequately serve the interests of FWS or the property owners, since in some cases the FWS property did not include "sensitive wetlands," and in other cases it included "property that is extremely high [beyond the high water mark of the ocean] and which Culebra Enterprises has considered that it owns."  DX 204 at 2.  Mr. Borges also noted that the "title documents" for Culebra Enterprises indicated that the southern boundary was the ocean.  *Id.*  Accordingly, Mr. Borges proposed an exchange of property that would resolve this "boundary dispute," giving FWS control over all the wetlands and the other landowners ownership of the areas beyond the "Maritime Zone, or the mean high-water mark."  *Id.*

Around the same time, Mr. Borges informed Herbert Katzin of the proposed exchange and provided him an aerial photograph with an overlay of the boundary lines from the 1987 FWS survey.  DX 205 at 3 (Letter from Herbert Katzin to FWS Regional Director, Apr. 1, 1987); DX 208 (Aerial Photograph of "La Pela Bay").  In April 1987, Herbert Katzin wrote to FWS, identifying himself as the owner (or half-owner) of certain land with reference to the survey markers, corresponding to the eastern boundaries of Parcels 2, 3, and 4.  DX 205 at 3.  Herbert Katzin stated that "our boundary situation has many similarities to that of Culebra Enterprises and I would like to explore with you the possibilities of a similar solution."  *Id.*  FWS responded in May 1987, stating that it was still "evaluating the benefits" of Mr. Borges' proposal, and that it would consider Herbert Katzin's proposal at the same time.  DX 206 (Letter from FWS Senior Realty Officer to Herbert Katzin (May 11, 1987)).  Herbert Katzin's attorney, Mr. Meléndez, responded to FWS a few weeks later, reiterating that Herbert and Annette Katzin were interested in resolving "the controversy with the boundaries," and providing the deeds for Parcels 2, 3, and 4, all of which indicated the property was bounded by the ocean.  DX 205 at 1.  No agreement was reached at that time with respect to these properties.

Meanwhile, Herbert and Annette Katzin negotiated a tentative agreement in 1989 to sell 22 of the 24 subdivided lots from Parcels 2 and 3 and their 50% interest in Parcel 4 to Ramón Cacho.  DX 45 (Purchase and Sale Agreement); Tr. 1241:14 to 1242:8 (Meléndez).  Mr. Cacho intended to develop the property into a "residential and/or resort type project."  DX 45 at 7-8.  The total purchase price for the properties was $2,500,000.  *Id.* at 2.  The draft sale agreement stated that the property was being sold subject to "any and all claims of the United States Fish and Wildlife Service."  *Id.*  The agreement was not signed and the sale of the properties to Mr. Cacho was never completed.  *Id.* at 11; Tr. 1244:16-18 (Meléndez).

In June 1994, another attorney representing Herbert and Annette Katzin, Miguel Cancio Bigas, wrote to FWS asking for the official position regarding the boundary between Parcels 2 and 3 and property claimed by FWS.  DX 46 (Letter from Miguel Cancio Bigas to FWS Regional Office (June 27, 1994)).  The letter stated that Herbert and Annette Katzin were "in the process of selling various contiguous parcels of land" and that "it is reasonable to expect that potential purchasers would eventually build one house in each lot."  *Id.* at 1.  The letter

acknowledged that there was a "maritime terrestrial zone" designated for public use along the "coastal area bordering the seaside lots," and that this zone "belonging to the United States was not transferred to the government of Puerto Rico as part of the 1970's transfer of lands." *Id.* at 1-2. Mr. Cancio raised concerns, however, about "rumors" that FWS may have a broader "public claim of ownership" to the "narrow strip of land" represented by the 1887 survey plan. *Id.* at 2. Mr. Cancio stated that the border represented in the 1887 plan was "impossible to define and trace today." *Id.* As a solution, Mr. Cancio proposed that FWS follow the same method as it did in 1987, where it stipulated in a federal district court case, *Martínez v. Junta de Planificacíon de Puerto Rico*, 736 F. Supp. 413, 415 (D.P.R. 1990), that the strip of land in the 1887 plan was equivalent to the legal maritime terrestrial zone. *Id.* at 3.

The following month after Mr. Cancio's letter, the FWS Assistant Refuge Manager, Susan Rice, met with a representative of Herbert and Annette Katzin to discuss the boundaries claimed by FWS as they related to the Katzins' property. Tr. 1318:22 to 1319:10 (Test. of Susan M. Rice, U.S. Fish & Wildlife Service (retired)). According to Ms. Rice's handwritten notes, the "Buena Vista Gun Mount" was the "only problem area," involving areas of approximately 10 acres and 2.2 acres. DX 48 at 2 (Notes of Susan Rice, July 7, 1994). Ms. Rice testified that she understood the 10-acre area to be the peninsula on the eastern side of Parcel 4 and the 2.2-acre area to be the former gun mount site. Tr. 1318:18-25 (Rice). Ms. Rice's notes also indicated that the representative "want[ed] a written thing to be able to sell [the] property," and that for the "mean-high tide" she would "walk with Félix and [the] Katzins' representative." DX 48 at 2. Ms. Rice recalled that the boundary dispute was not resolved at that time. Tr. 1313:1-6 (Rice). The 1994 FWS Annual Narrative Report for the Culebra Wildlife Refuge noted that FWS personnel (including Félix López, a biologist) had visited Culebra "to negotiate the refuge boundary in the western portion of the Puerto del Manglar Unit." DX 49 at 62.[12] It also stated that Bill Mailloux, a "realty representative" for landowners in the area, had "agreed upon a 20 meter conservation easement behind the mutually determined boundary which delineates the maritime zone," and that FWS would "attempt to obtain this same arrangement for the rest of the unit." *Id.* FWS stated, however, that the easement agreement would not include "a 10 acre tract currently in ownership dispute with Dr. Herbert Katzin, and a 2.25 acre former military gun mount site." *Id.*

In September 1995, Dr. Katzin and Ms. Katzin, as trustees for Herbert and Annette Katzin, entered into an agreement with the United States in which the government quitclaimed all rights to the property beyond the maritime terrestrial zone in former Parcels 2 and 3 (Lots 15, 17, 19, 22, 23, and 24) in exchange for a conservation easement extending 20 meters beyond the maritime zone. DX 51T at 4, 11-12 (Agreement of Exchange of Fee Interest for Conservation Easement, Oct. 3, 1995).[13] This agreement did not apply to Parcel 4.

C. *Plaintiffs' Attempted Sale of Parcel 4 and the Ensuing Dispute Over Ownership*

---

[12]The "Puerto del Manglar Unit" is defined elsewhere in the report as "a fringe of mangroves around a highly productive bay," presumably referring to the bay to the northeast of Parcel 4 labelled as "Puerto del Manglar" on the 1887 survey plan. DX 49 at 56.

[13]The agreement was signed by Dr. Katzin and Ms. Katzin on September 29, 1995 in Atlanta, Georgia, but it was "protocolized" in Puerto Rico by Mr. Meléndez the following month. DX 51 at 1-4.

    1.  *Listing of the property and contract with Mr. Klaber.*

Dr. Katzin, Ms. Katzin, and Ms. Winters entered into a listing agreement with Sandra Wagner in May 2005 to sell Parcel 4 as one undivided property. DX 72 (Blue Horizon Realty Listing Agreement, May 27, 2005). The agreement described Parcel 4 as "[a]pproximately 67.5 cuerdas [of] raw land," which is consistent with the size of the property in the deed of partition and property registry entry, and approximately 3.3 cuerdas smaller than the size in the later Fletcher survey. *Id.*; *compare* PX 422T at 5, *with* DX 28T at 9-10, *and* PX 416T at 4. The selling price in the listing agreement was $4,725,000. DX 72. The agreement specified that Alberic Colón, a neighboring property owner, was a "[c]urrent prospective buyer[]" for whom the provisions of the agreement (*i.e.*, Ms. Wagner's commission) would not apply. *Id.*

On March 23, 2006, William Klaber signed a purchase agreement to buy Parcel 4 for $4 million. PX 282 (Purchase Agreement, Mar. 26, 2006). Mr. Klaber made a $50,000 earnest money deposit on the property, with the remainder to be due at a closing scheduled for June 30, 2006. *Id.* at 1. The agreement stated that Mr. Klaber had the right to assign the agreement "to an entity in which he is a principal," which in effect referred to a group of investment partners with whom Mr. Klaber intended to develop the property. *Id.*; Tr. 266:8-14, 278:11 to 282:12 (Test. of William Klaber). Concurrently, Mr. Klaber and his partners also agreed to purchase two other lots owned by Dr. Katzin and Ms. Katzin, Lots 8 and 12 in Punta del Viento Estates (formerly Parcels 2 and 3). PX 459 (Agreement of Sale, Mar. 16, 2006); Tr. 296:15 to 297:11 (Klaber). Annette Katzin and Ms. Winters were listed as the sellers and signed the purchase agreement three days later. PX 282.

In early June 2006, Mr. Klaber asked his attorney, Claudia Motta, to explore ways to "get . . . out of the deal" to purchase Parcel 4 and get back the earnest money deposit. Tr. 303:9-17 (Klaber). According to Mr. Klaber, he and his partners had decided to back out of the deal because of restrictions on development along the coast of Culebra, economic conditions in Puerto Rico, and uncertainties about whether Parcel 4 could be subdivided like the rest of the properties in Punta del Viento. Tr. 266:22 to 267:9 (Klaber). Ms. Motta sent an e-mail to her partner in her law firm on June 5, 2006 stating that she was reviewing the purchase agreement for Parcel 4 to find a way to avoid completing the sale and obtain a refund of the $50,000 deposit. PX 286 (E-mail from Claudia Motta to Carlos Fernando Lugo (June 5, 2006)). Ms. Motta noted that the purchase agreement provided for a refund of the deposit to the buyer if, within the 30-day due diligence period, the buyer discovered "any fact related to zoning, title and land survey, current easements, real estate taxes and assessments or legal access are not as represented." *Id.* Ms. Motta stated that an agreement signed by Dr. Katzin and Ms. Katzin on September 29, 1995 relating to Parcels 2 and 3 established a 20-meter conservation easement applicable to Parcel 4. *Id.*[14] Ms. Motta indicated that she believed that the sellers' failure to disclose this easement to Mr. Klaber could trigger a refund of the deposit, although she noted that the due diligence period had already expired. *Id.*

Mr. Klaber also contacted the sellers' attorney, Roberto Berríos Falcon, to express concerns about the waterfront rights for Parcel 4. Tr. 267:21 to 269:16 (Klaber). Mr. Berríos

---

    [14]Ms. Motta was mistaken in this assessment, since the easement agreement only applied to Lots 15, 17, 19, 22, 23, and 24 in Punta del Viento Estates, to the south of Parcel 4. DX 51T at 11-12.

sent Mr. Klaber a letter on June 14, 2006 stating that "[t]he existence of a limitation to title on all properties that are bound by the sea or ocean is a matter of general knowledge and statutory origin in Puerto Rico. . . . The limitation is generally restricted to an easement in a band of land close to the shoreline; the exact width and legal consequence [are] a matter of continuous debate." DX 54 (Letter from Berríos to Klaber (June 14, 2006)). Mr. Berríos also clarified that the 1995 conservation easement agreement did not apply to Parcel 4. *Id.* Ms. Wagner followed up with Mr. Klaber via e-mail on June 15, 2006, stating that she understood that Ms. Motta had "questions regarding waterfront rights on Parcel 4." PX 446 (E-mail from Wagner to Klaber (June 15, 2006)). Ms. Wagner noted that "the situation here is the same that exists almost everywhere in the world, i.e., various government entities limit activities along the waterfront," and that, in her opinion, Ms. Motta "may be overstating the importance of the 'Treaty of Paris.'" *Id.* Mr. Klaber responded via e-mail later that day that he was "losing [his] investors over this title stuff" and that "[t]he crisis in [Puerto Rico] last month put everyone on edge." PX 445 (E-mail from Klaber to Wagner (June 15, 2006)). Mr. Klaber nonetheless indicated that he remained interested in completing the purchase, writing that "I'm trying to put the pieces back together," but he also noted that "it doesn't look as though we are going to make the June 30 deadline" for closing on the sale of Parcel 4. *Id.*

On June 15, 2006, Ms. Motta e-mailed John Beasley, an FWS representative, to ask about any rights FWS claimed to Parcel 4. PX 288 at 2 (E-mail from Motta to John Beasley (June 15, 2006)). Mr. Beasley had previously sent Ms. Motta information about the conservation easement pertaining to the lots in Punta del Viento Estates to the south of Parcel 4. *Id.* Mr. Beasley responded on June 22, 2006, indicating that he was about to send Ms. Motta three documents via facsimile: (1) a copy of the relevant portion of the 1887 survey map; (2) a "tracing" of the survey plan with properties claimed by FWS annotated; and (3) the *Federal Register* notice in 1982 of the transfer of properties to FWS. *Id.* (E-mail from Beasley to Motta (June 22, 2006)). Mr. Beasley explained that the area labelled "1e" on the tracing was "the maritime zone," and the area labelled "1f" was "an old gun mount site purchased by the Navy in 1903 from Escolastico Mulero," as recorded in the property registry. *Id.* Mr. Beasley also sent Ms. Motta what appears to be an inset of the 1947 Navy property graphic identifying the peninsula to the east of Parcel 4 as "Parcel Buena Vista" and stating its size as 10.01 acres. PX 288 at 7; *see also* DX 11 (1947 Navy property graphic). Finally, Mr. Beasley sent what appears to be a larger version of the survey plan "tracing" with the "Buena Vista" parcel outlined by hand and labelled as 10.01 acres. PX 288 at 8. These documents, taken together, were ambiguous as to whether FWS was claiming ownership of a 2.25-acre gun mount site, a 10.01-acre peninsula, or both. Ms. Motta testified that she discussed the contents of Mr. Beasley's facsimile with Mr. Klaber, including the fact that FWS claimed ownership of a 2.25-acre gun mount site within Parcel 4. Tr. 587:16 to 588:20; 590:19 to 591:1 (Motta). At trial, Mr. Klaber testified that he had never seen the documents sent in the facsimile and that he was not aware of FWS's claim to the gun mount site at the time he decided not to complete the purchase of Parcel 4. Tr. 273:7-24, 298:22 to 299:19 (Klaber).



PX 288 at 4 ("tracing" of the 1887 survey plan with purported FWS properties annotated).



PX 288 at 8 (inset of 1947 Navy property graphic).

On June 20, 2006, two days before Mr. Beasley sent Ms. Motta the FWS documents regarding Parcel 4, Mr. Klaber told Ms. Wagner that "because of a 'flaw' in the titles of all three properties" (referring to Parcel 4 and Lots 8 and 12), he and his partners wanted to propose a "compromise" to purchase only Lots 8 and 12 and apply the $50,000 deposit for Parcel 4 to the purchase price of the other two properties.  PX 443 (E-mail from Wagner to Ms. Katzin (June 23, 2006)).  According to Ms. Wagner, however, Ms. Motta asked Mr. Berríos to "prepare the three deeds" for the properties the following day (June 21st).  *Id.*  Ms. Wagner sent an e-mail to Mr. Klaber on June 22nd to let him know that Mr. Berríos was preparing the deeds, while still working to "clarify the waterfront issues," and asked whether this was "consistent with [his] wishes/understanding."  PX 444 (E-mail from Wagner to Klaber (June 22, 2006)); Tr. 296:15 to 297:11 (Klaber).  On June 23rd, Ms. Wagner informed Ms. Katzin about the compromise that Mr. Klaber had proposed earlier that week.  PX 443.

Ms. Motta mailed a letter to Annette Katzin and Ms. Winters on June 28, 2006 stating that Mr. Klaber would not complete the purchase of Parcel 4.  PX 291 (Letter from Motta to Annette Katzin and Ms. Winters (June 28, 2006)).  Ms. Motta stated that Mr. Beasley had

28

informed her that "a portion of Lot 4 is property of the [FWS], a fact that was not previously disclosed to our clients in the Purchase Agreement, nor was it disclosed by the title study for Lot 4 dated May 10, 1996." *Id.* The letter did not specify which portion of Parcel 4 she believed belonged to FWS, or whether this FWS property included the maritime zone, the gun mount site, or the entire peninsula. *Id.* The letter also demanded the return of the $50,000 earnest money deposit. *Id.* Mr. Klaber and his partners ultimately purchased four lots to the south of Parcel 4 (Lots 8, 12, 13, and 20) from Dr. Katzin and Ms. Katzin in August 2006 for a combined purchase price of $3.2 million. PX 439 (Closing Statement (Aug. 7, 2006)).

2. *Discussions with Dr. Jorge Orbay about potential purchase of Parcel 4.*

In August 2006, Dr. Jorge Orbay, a hand surgeon and manager of a real estate development company, contacted Ms. Wagner because he was interested in buying "a waterfront property in Culebra of moderate size and with the intentions of developing a boutique style resort." PX 438 (E-mail from Dr. Orbay to Wagner (Aug. 3, 2006)); Tr. 316:22 to 317:12 (Test. of Dr. Orbay). Dr. Orbay considered buying Parcel 4 at that time, but it was taken off the market for roughly a year. Tr. 320:4-10 (Orbay). When Parcel 4 was again listed for sale around August 2007, Dr. Orbay considered purchasing the property for development purposes. Tr. 320:11-18 (Orbay). In October 2007, Dr. Orbay sent Ms. Wagner a letter of intent stating that his development company was interested in purchasing Parcel 4 for $4.6 million, with a good faith deposit of $460,000. PX 480 (Letter from Dr. Orbay to Wagner (Oct. 9, 2007)).[15] However, Dr. Orbay never signed a purchase agreement for the property. Tr. 320:23 to 321:1 (Orbay).

On December 5, 2007, Dr. Orbay sent an e-mail to Ms. Wagner in which he thanked her for providing him an "environmental study document," and stated that he was "surprised by the fact that two 'cuerdas' of the property actually belong to the Fish and Wildlife Service." PX 474 (E-mail from Orbay to Wagner (Dec. 5, 2007)). Ms. Wagner responded the following day, stating that in September 2007 she had informed Dr. Orbay of this claim and about a "ten-meter wide bank of land all along the waterfront . . . where no permanent structure can be built." PX 473 (E-mail from Wagner to Orbay (Dec. 6, 2007)). Ms. Wagner stated that FWS "can not find any evidence of a gun mount and they have indicated separately to me and to Attorney Berríos that they have no interest in maintaining title to the two cuerdas and that they will not hinder the development of lot 4. Their only interest is in the maritime zone." *Id.* at 1-2. Dr. Orbay reiterated that although he was aware of the "coastal strip," he did not know about the additional "2.25 acres," and stated:

> [An FWS] reserve within the property has ominous implications for any future development as the owner will have to provide public access to it and cannot build or utilize this land. It is interesting that nobody knows where these 2.25 acres are, highlighting that this is a new issue brought upon this transaction. We must now evaluate the consequences brought forth by this new finding.

*Id.* at 1 (E-mail from Orbay to Wagner (Dec. 6, 2007)).

---

[15] Although the letter was erroneously dated "October 9, 2006," the parties stipulated at trial that the date should have been October 9, 2007. Tr. 343:3 to 344:6 (Orbay).

On February 6, 2008, Mr. Berríos informed Dr. Orbay that he was attempting to exchange property with FWS to release the claim on the 2.25-acre gun mount site.  PX 492 (E-mail from Berríos to Wagner and Orbay (Feb. 6, 2008)).  Later that month, Mr. Berríos informed Dr. Orbay that FWS had sent a letter confirming its willingness to move forward with the property exchange, if Dr. Orbay was "still interested in moving forward with the transaction." PX 488 (E-mail from Berríos to Orbay (Feb. 2008)).  Contemporaneously, Dr. Orbay told Mr. Berríos and Ms. Wagner that his development company was interested in building a "small dinghy dock" on the property as part of the planned resort.  PX 491 (E-mail from Orbay to Berríos (Feb. 8, 2008)).  Mr. Berríos responded that it would be "very difficult to obtain a permit for any type of dock structure" because of protected mangroves and other plants in the area.  *Id.* (E-mail from Berríos to Orbay (Feb. 8, 2008)).

Dr. Orbay informed Mr. Berríos and Ms. Wagner on February 28, 2008 that he was no longer interested in purchasing Parcel 4.  PX 488.  Dr. Orbay stated that he could no longer pursue the development project because he would be "overextending" himself.  *Id.*  He testified that his brother, sister, and other potential investors had backed out, in part because of the real estate crash of 2008, and his development company could not do the project alone because it had already bought other property in the Bahamas.  Tr. 331:6 to 332:11 (Orbay).  Dr. Orbay testified at trial that the United States' claim of ownership was not the reason for his decision to not purchase Parcel 4.  Tr. 332:15-18 (Orbay).

### 3.   *Offers from other potential buyers.*

On June 16, 2008, a company named Global Emerging Markets ("GEM") sent a letter titled "Expression of Interest" to Mr. Berríos.  PX 306 (Letter from GEM to Berríos (June 16, 2008)).  In this letter, GEM proposed to purchase Parcel 4 for $3,876,200, which included a payment of $1,500,000 at closing and an additional $2,376,000 ($2,000,000 plus $376,000 of interest at 9%) after two years.  *Id.* at 1.  The proposed purchase price expressly included consideration for "the contingent claim of [FWS] on yet to be determined coordinates regarding the ownership of 2.25 acres of land" within Parcel 4.  *Id.*  Mr. Berríos forwarded this letter to Ms. Wagner on July 2, 2008, stating that the sellers wanted to make a counteroffer of $4 million as the purchase price with $1,200,000 due at closing and $2,800,000 due at the end of five years, with quarterly interest payments of 7%.  PX 487 (E-mail from Berríos to Wagner (July 2, 2008)).  GEM's purchase of Parcel 4 was never completed.  Tr. 224:15 to 225:11 (Dr. Katzin).

In September 2009, the owner of the property north of Parcel 4, Mr. Alberic Colón, offered to purchase 30 cuerdas of Parcel 4 for $1.5 million.  PX 498 (Proposed Purchase Agreement (Sept. 7, 2009)); Tr. 225:13 to 226:14 (Dr. Katzin).  The 30 cuerdas in the proposed purchase were on the northeast side of Parcel 4, adjacent to Mr. Colón's property, and included the peninsula on the east side of Parcel 4.  DX 356 at 2 (E-mail from Wagner to Berríos (Sept. 8, 2009)); Tr. 551:13 to 552:3 (Wagner).  Ms. Wagner had told Mr. Colón about FWS's claim to a 2.25-acre gun mount site on the peninsula before Mr. Colón made the offer to buy this property, and Mr. Colón stated that he was not concerned about that claim.  Tr. 556:10 to 557:15 (Wagner).  Mr. Colón also stated that he did not intend to develop the 30 cuerdas, and was interesting only in "protect[ing] the view and privacy of his home."  DX 356 at 2.  Mr. Colón signed a purchase agreement similar to the agreement previously signed by Mr. Klaber in 2006, and wrote a check to Ms. Wagner's realty firm for $150,000 as an earnest money deposit.  PX

498.  The sellers did not accept Mr. Colon's offer.  DX 356 at 1 (E-mail from Wagner to Berríos (Oct. 30, 2009)); Tr. 557:16 to 558:6 (Wagner).

## JURISDICTION

In its ruling on the government's motion to dismiss plaintiffs' claims under RCFC 12(b)(1) and 56, the court considered and rejected the government's arguments that the claims were barred by the statute of limitations contained in 28 U.S.C. § 2501, or, alternatively, that these claims should be barred by the equitable doctrine of laches.  *Katzin*, 120 Fed. Cl. at 213-16.  The government has reasserted these arguments, claiming that additional facts adduced at trial establish that plaintiffs' claims are barred, or should be barred through an exercise of the court's discretion.  Def.'s Post-Trial Br. at 48-62.  The court consequently has reviewed the government's arguments in light of the facts adduced at trial.

### A.  *Statute of Limitations*

The Tucker Act grants this court "jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, . . . or for liquidated or unliquidated damages in cases not sounding in tort."  28 U.S.C. § 1491(a)(1).  Pursuant to 28 U.S.C. § 2501, however, this court's jurisdiction is limited to claims "filed within six years after such claim first accrues."  This statute of limitations is a jurisdictional requirement, and unless that requirement is met, the court has no juridical power to consider the merits of the case.  *John R. Sand & Gravel Co. v. United States*, 552 U.S. 130, 136 (2008).

A claim accrues "when all events have occurred to fix the [g]overnment's alleged liability, entitling the claimant to demand payment and sue here for his money."  *Samish Indian Nation v. United States*, 419 F.3d 1355, 1369 (Fed. Cir. 2005) (quoting *Martinez v. United States*, 333 F.3d 1295, 1303 (Fed. Cir. 2003) (en banc)).  Before a claim can accrue, the plaintiff either must have been aware or should have been aware of the events fixing the government's alleged liability.  *Katzin*, 120 Fed. Cl. at 209 (citing *Hopland Band of Pomo Indians v. United States*, 855 F.2d 1573, 1577 (Fed. Cir. 1998)); *Kingman Reef Atoll Dev., L.L.C. v. United States*, 116 Fed. Cl. 708, 772 (2014) (citing *Casitas Mun. Water Dist. v. United States*, 708 F.3d 1340, 1359 (Fed. Cir. 2013)); *see also Navajo Nation v. United States*, 631 F.3d 1268, 1273-74 (Fed. Cir. 2011)).  In a takings case, "the act that causes the taking also causes the accrual of a takings claim."  *Kingman Reef Atoll*, 116 Fed. Cl. at 772.  In short, a takings claim accrues "when the United States interferes with a plaintiff's property rights."  *Katzin*, 120 Fed. Cl. at 214 (citing *Yuba Goldfields, Inc. v. United States*, 723 F.2d 884, 889 (Fed. Cir. 1983); *Central Pines Land Co. v. United States,* 107 Fed. Cl. 310, 325 (2010)).  And, "what counts [for a takings claim] is not what [the] government said it was doing, or what it later says its intent was, or whether it may have used the language of a proprietor.  What counts is what the government *did*."  *Yuba Goldfields,* 723 F.2d at 889 (emphasis in original)) (holding that "the period of taking, if taking there be, terminated when the United States acceded to restoration of Yuba's [property] rights," *id.* at 890).

This case was filed on June 15, 2012.  Accordingly, for the court to have jurisdiction, the statute of limitations would require that the plaintiffs' claims must have accrued no earlier than June 15, 2006.  The specific "takings" alleged by the plaintiffs are that (1) the government

interfered with their property rights, as demonstrated by the fact that Mr. Klaber rescinded his agreement to purchase Parcel 4, and (2) the government "has taken for public use" all property for which it continues to claim ownership, preventing plaintiffs from selling Parcel 4 for its true value. Pls.' Post-Trial Br. at 22-28.

Mr. Klaber signed the purchase agreement in March 2006. PX 282. It was not until Mr. Beasley of the FWS faxed documents to Ms. Motta on June 22, 2006, asserting FWS claims to the maritime zone, the gun mount site, and the peninsula, that Mr. Klaber rescinded the purchase agreement for Parcel 4. PX 291. As a result, the relevant event that fixed the government's alleged liability was the assertion of ownership by FWS on June 22, 2006, followed by the Klaber contract's formal rescission on June 28, 2006 pursuant to Ms. Motta's letter. PX 291. Mr. Klaber's testimony that he either ignored the FWS's claim or was unaware of it was not credible in light of the chain of events and Ms. Motta's contrary testimony. Although the evidence shows that Mr. Klaber considered "get[ting] out of the deal" in early June 2006, the evidence also shows that he was still working to close the deal on June 15, 2006. Notably, Mr. Klaber was "put[ting] the pieces" of the investment plan "back together" and "working on this." PX 445. It was not until Mr. Beasley of the FWS sent the facsimile asserting ownership that Mr. Klaber pulled out of the deal.[16]

The record in this case shows that plaintiffs or their predecessors in interest (Herbert and Annette Katzin) knew or had reason to know of the government's claims to the maritime zone and the former gun mount site prior to the contract with Mr. Klaber. *E.g.*, DX 205 (1987 correspondence between Herbert Katzin and FWS regarding property boundaries). Nonetheless, "the crucial question in this case is when the United States first *interfered* with the [plaintiffs'] enjoyment of the subject property." *Katzin*, 120 Fed. Cl. at 214 (emphasis added). In this respect, the additional evidence submitted at trial does not change the court's prior determination that, in the context of plaintiffs' claims, the government did not interfere with their property rights until the FWS asserted its claim of ownership by the communication to Mr. Klaber's counsel. That Mr. Klaber subsequently rescinded his contract, and the FWS thereafter has continued to assert its ownership confirms the government's interference with plaintiffs' property interests.

As the court's prior opinion discussed, "mere assertion[s]" of government ownership do not amount to interference with property rights. *Katzin*, 120 Fed. Cl. at 214 (quoting *Central Pines Land Co.*, 107 Fed. Cl. at 325). The disputes over ownership rights prior to June 2006 were never refined to the point of interfering with plaintiffs' use and enjoyment.[17] The record

---

[16]The court recognizes that the "proper focus for statute of limitations purposes is upon the time of the [defendant's] *acts*, not upon the time at which the *consequences* of the acts became most painful." *Goodrich v. United States*, 434 F.3d 1329, 1333-34 (Fed. Cir. 2006) (quoting *Fallini v. United States*, 56 F.3d 1378, 1383 (Fed. Cir. 1995) (in turn quoting *Delaware State Coll. v. Ricks*, 449 U.S. 250, 258 (1980))) (emphasis added in *Goodrich*). In this instance, both Mr. Beasley's action on behalf of FWS and Mr. Klaber's response are separated by only several days and both fall within the limitations period.

[17]The only evidence on point that the government adduced at trial was testimony regarding placement of survey markers and wildlife refuge signs. That placement could have related to the maritime zone, which plaintiffs concede the government controls. In short, there is no evidence that the Navy or FWS ever took steps to occupy or use the portion of Parcel 4 in

shows that in 1989, Herbert and Annette Katzin tentatively agreed to sell their 50% interest in Parcel 4 to Mr. Cacho, and that contemporaneously they were attempting to negotiate with FWS over the exact boundary lines of that property.  DX 45.  However, plaintiffs have not alleged, nor has the government established, that any FWS claims of ownership interfered with that proposed sale.  Similarly, in the mid-1990s Herbert and Annette Katzin revisited the issue of the maritime zone's terrestrial border and were able to negotiate a conservation easement with FWS for the properties comprising Punta del Viento Estates (former Parcels 2 and 3).  DX 51T.  It appears that an unidentified representative of the Katzins also met with an FWS representative, Ms. Rice, in an effort to clarify the boundaries of Parcel 4 so that it could be sold, and Ms. Rice's notes state that there was a "problem" with a 10-acre area and a 2.25-acre area.  DX 48 at 2.  But that does not amount to government interference, nor does it amount to an assertion of title.  This evidence does not establish that the lack of clarity over boundaries and the location of the gun mount prevented the Katzins from selling or otherwise exercising their rights to Parcel 4 prior to June 2006.

In short, the plaintiffs have established that the government's actual interference with their property rights began on June 22, 2006, when Mr. Beasley sent a facsimile to Mr. Klaber's counsel, culminating six days later on June 28, 2006, with the rescission by Mr. Klaber of his contract.  Plaintiffs have also shown that this interference has continued since that time.  Although the plaintiffs and their predecessors in interest may have known or had reason to know of the government's claims to the maritime zone or a former gun mount site prior to 2006, evidence does not show that these ownership claims amounted to actual interference with the plaintiffs' property rights.  Accordingly, plaintiffs' claims in the present case accrued on June 22, 2006 and are therefore not barred by the six-year statute of limitations in 28 U.S.C. § 2501.

## B.  *The Equitable Doctrine of Laches*

In its prior motion to dismiss, the government invoked the doctrine of laches primarily to argue that the passage of time had impaired its ability to establish its statute of limitations defense.  The court previously found that these arguments "lack persuasive force" because the evidence claimed by the government to be unavailable would not have established that plaintiffs' claims accrued outside of the limitations period.  *Katzin*, 120 Fed. Cl. at 216.

The doctrine of laches is based on concepts of fairness.  At its heart is the idea that plaintiffs should not be allowed to "sleep on their rights" to the detriment of the defendant. *Katzin*, 120 Fed. Cl. at 209-10 (quoting *Ikelionwu v. United States*, 150 F.3d 233, 237 (2d Cir. 1998)).  In cases where a statutory limitations period applies, courts generally do not invoke the doctrine of laches to shorten this period unless there has been substantial prejudice to the defendant.  *Id.* (citing *Lankster v. United States*, 87 Fed. Cl. 747, 755 (2009)).

To prevail on an affirmative defense of laches, a defendant must demonstrate that (1) "the plaintiff delayed filing suit for an unreasonable and inexcusable length of time from the time the plaintiff knew or reasonably should have known of its claim against the defendant," and (2) this delay "operated to the prejudice or injury of the defendant." *Katzin*, 120 Fed. Cl. at 210 (quoting

---

question, *i.e.*, the peninsula.  *Compare* DX 132 (1972 Navy report indicating the coastal strip and gun mount sites were "excess"), *with* Tr. 208:8 to 211:6 (Dr. Katzin) (testimony about unsuccessful attempts to locate any evidence of a naval gun emplacement on the peninsula).

*Lankster*, 87 Fed. Cl. at 755).  A defendant can establish either "economic prejudice," where the cost of defense has significantly increased due to the delay, or "defense prejudice," where the defendant is impaired in its ability to defend against the suit due to the passage of time – for example, because evidence has been lost or witnesses are unavailable.  *Id.* (citing *Cornetta v. United States*, 851 F.2d 1372, 1378 (Fed. Cir. 1988) (en banc)); *Abernethy v. United States*, 108 Fed. Cl. 183, 190 (2012).

It its post-trial brief, the government repeats many of the arguments it made previously, including that (1) Herbert Katzin, who died in 1995, could have testified about his discussions with FWS regarding the boundary "dispute;" (2) Annette Katzin, who began having memory problems several years ago and died during the pendency of this case, could have provided similar testimony; (3) former FWS or Navy personnel could have testified about additional actions taken by the government to establish control or possession of property in or around Parcel 4; and (4) the memories of other witnesses – including Mr. Meléndez, Ms. Rice, and Ms. Winters – had faded to the point that their testimony as to plaintiffs' notice of the United States' ownership claims was ineffective.  Def.'s Post-Trial Br. at 58-61.  In making these arguments, the government focuses almost exclusively on the issue of plaintiffs' notice of the government's ownership claims, as opposed to whether the government's actions actually interfered with plaintiffs' property rights.  Without the "interference" prong of the claim accrual test, *see Yuba Goldfields*, 723 F.2d at 889, the government simply cannot establish that plaintiffs' claim accrued prior to June 22, 2006.

The government also contends that plaintiffs' alleged "delay" in filing their takings claims prejudiced the government's "title argument."  Def.'s Post-Trial Br. at 61-62.  For example, the government asserts that José Gómez Velázquez, who has died, and Alfredo Quiñones Clemente, who could not be located, could have testified as to why their surveys of Parcel 4 and the property from which it was subdivided did not include the peninsula to the east of Parcel 4.  *Id.* at 61.  Relatedly, testimony from Herbert and Annette Katzin allegedly could have better exposed the "flaws in the Fletcher survey," since Ms. Winters' memory as to the conditions surrounding this survey had faded.  *Id.*  These claims by the government are unavailing because the court has a full record of title to the property at issue.

"The government bears a 'relatively heavy burden of proof' of showing sufficient defense prejudice to invoke laches 'to shorten the statutory period.'"  *Katzin*, 120 Fed. Cl. at 216 (quoting *Lankster*, 87 Fed. Cl. at 755 (in turn citing *Cornetta*, 851 F.2d at 1380 (en banc))).  That burden has not been met, and the court rejects the government's laches defense.

## STANDARDS FOR DECISION

The Takings Clause of the Fifth Amendment provides that "private property [shall not] be taken for public use, without just compensation."  U.S. Const. amend. V.  The inquiry into whether private property has been taken for public use is "a question of law based on factual underpinnings."  *Arkansas Game & Fish Comm'n v. United States*, 87 Fed. Cl. 594, 614 (2009) (quoting *Wyatt v. United States*, 271 F.3d 1090, 1096 (Fed. Cir. 2001)), *rev'd*, 637 F.3d 1366 (Fed. Cir. 2011), *rev'd and remanded*, ___ U.S. ___, 133 S.Ct. 511 (2012), *aff'd after remand*, 736 F.3d 1364 (Fed. Cir. 2013).  Accordingly, the plaintiffs in this case must prove "the relevant factual underpinnings of [their] claim against the United States, and must generally proffer 'evidence which is more convincing than the evidence which is offered in opposition to it.'"  *Id.*

(quoting *Jazz Photo Corp. v. United States*, 439 F.3d 1344, 1350 (Fed. Cir. 2006) (in turn quoting *Hale v. Department of Transp., Fed. Aviation Admin.*, 772 F.2d 882, 885 (Fed. Cir. 1985))).

To establish a claim under the Takings Clause, the plaintiffs must prove that (1) they have a "cognizable property interest" in the property allegedly taken by the government, and (2) the government's actions with respect to that property constituted a "compensable taking of that property interest." *Kingman Reef Atoll Dev.*, 116 Fed. Cl. at 746 (quoting *Huntleigh USA Corp. v. United States*, 525 F.3d 1370, 1377 (Fed. Cir. 2008) (in turn quoting *American Pelagic Fishing Co. v. United States*, 379 F.3d 1363, 1372 (Fed. Cir. 2004))). The extent of a plaintiff's "cognizable property interest" is determined through application of state law. *E.g., Phillips v. Washington Legal Found.*, 524 U.S. 156, 164 (1998) (citing *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972)). In this instance, the court looks to the law of Puerto Rico to delineate plaintiffs' property interests. *See Alvarez v. United States*, 42 Ct. Cl. 458, 474-79 (1907) (applying Puerto Rican property law to plaintiff's takings claim and observing that Puerto Rican property law originated in Spanish law, but deciding that the right to hold public office was not a cognizable property right). If plaintiffs' property interests are proven, a compensable taking of such property interests occurs with governmental actions that amount to "appropriation of private property," *Huntleigh*, 525 F.3d at 1378, such that the government has "preempt[ed] the owner[']s right to enjoy his property for an extended period of time," *Ridge Line, Inc. v. United States*, 346 F.3d 1346, 1356 (2003).

## ANALYSIS

### A. *Property Interests With Respect to Parcel 4*

It is undisputed that plaintiffs jointly have fee simple title to Parcel 4, resulting either from inheritance (Ms. Winters) or purchase (Dr. Katzin and Ms. Katzin). *E.g.*, Def.'s Post-Trial Br. at 16-24 (recounting plaintiff's acquisition of title to Parcel 4). It is also undisputed that the government has rights to a "maritime terrestrial zone" as it was defined under Spanish law – the seaward area beyond the high water mark of the ocean, including the mangroves growing in this area – as well as a "rescue easement" extending inland 20 meters beyond the maritime terrestrial zone. *E.g.*, Pls.' Post-Trial Br. at 6-7 (acknowledging the government's rights to these areas). Accordingly, the dispute in this case is limited to two areas of land claimed by the government: (1) the 10.01-acre peninsula on the eastern side of Parcel 4,[18] and (2) a 2.25-acre parcel of land acquired by the U.S. Navy in 1903, which the government claims is also located somewhere on that 10.01 acre peninsula. The court will address each of these areas in turn.

### 1. *The 10.01-acre peninsula on the eastern side of Parcel 4.*

---

[18]The size of this peninsula is reported inconsistently in the record. A Navy property graphic from 1947 indicates the size of the peninsula ("Parcel Buena Vista") is 10.01 acres, DX 11, and FWS later referred to it as a "10-acre tract" for which there was a property dispute, *e.g.*, DX 49 at 61 (1994 FWS Annual Narrative Report). Mr. Bidot contrastingly testified that the peninsula was approximately 15 cuerdas (14.57 acres). Tr. 1371:7-14, 1373:7 to 1377:19 (Bidot). Because the court is primarily concerned with the government's claim to this area, it will use the size cited in the Navy's and FWS's documents.

Plaintiffs trace fee simple title to Parcel 4, including the peninsula, through a chain of title extending back to the late 1800s. This title can be briefly summarized as follows. Parcel 4 roughly corresponds to the area designated as Lot 24 on the original 1887 survey plan of Culebra. PX 3T at 6; Tr. 665:3-6 (Rosa). Lot 24 was described in the Puerto Rican Property Registry as bounded on the east by the sea. PX 420 at 11. Over the next several decades, this lot was grouped with and segregated from other adjacent properties until it was eventually sold to Pilar Gonzalez Alhoyo in 1940 as Property No. 270. PX 415T. After Mr. Gonzalez's death in 1963, Property No. 270 was divided among his heirs. *Id.* at 11-14. Ms. Winters and Luz Kjeldsen McLaughlin jointly received Parcel 4 as their portion of Mr. Gonzalez's estate. DX 28T at 11. Parcel 4 was described in the deed as bounded on the north by Parcel 5, on the south by Parcels 1 and 3, on the east by the sea, and on the west by Parcels 1 and 6. *Id.* at 9-10.

The government asserts that plaintiffs do not have a property interest in the 10.01-acre peninsula on the eastern side of Parcel 4 because the Gómez survey, referenced in the deed creating the parcel, does not depict the peninsula. Def.'s Post-Trial Br. at 64-66. The government also points to the fact that the deed for Parcel 4 states its size as 67.5034 cuerdas, and Mr. Bidot later determined that this size matched the depiction of Parcel 4 in the Gómez and Quiñones surveys, not inclusive of the peninsula. *Id.* at 70-72; *see also* Tr. 1368:19 to 1369:10 (Bidot). The government speculates that the peninsula was instead land acquired at some point by the U.S. Navy, which would explain why the deed for the parent tract, Property No. 270, indicates a border with "lands of the Department of the Navy," as well as why the peninsula was included as a separate parcel in the Puerto Rican tax records. Def.'s Post-Trial Br. at 72, 74; PX 415T at 4. There is no proof to support that speculation, however.

The property registry contains no indication whatsoever that the government, or any other owner for that matter, separately acquired title to the peninsula such that it was segregated from the remainder of the property. Starting with the creation of Property No. 167 in 1909, the larger property from which Parcel 4 was later divided was described as being bounded on the east with "the sea and land of the United States, Department of the Navy." *E.g.*, PX 412T at 4. There is no further indication, however, of where this "Department of Navy" land is located. The only evidence before the court of land recorded in the property registry in favor of the Navy is Property No. 120, the 2.25-acre tract sold by Mr. Mulero in 1903 as a site for a gun mount. PX 411T. Even if this tract was located on the peninsula, which the court finds it is not, *see infra,* at 37-39, this would not account for the removal of the entire 10-acre peninsula from the property.

The fact that the size of Parcel 4 is listed in the deed and in the property registry as 67.5 cuerdas is not dispositive of the parcel's actual size when that size is in conflict with the specific boundaries described in those documents. *See Veve y Diaz v. Sanchez*, 226 U.S. 234, 240 (1912) (finding that under both common law and Puerto Rican law, "calls for quantity must yield to the more certain and locative lines of the adjoining owners," which are "treated as a sort of natural monument, and must prevail over the more general and less distinct designation by quantity").[19] The deed itself suggests there was some ambiguity in the exact size of the parent property,

---

[19]In the *Veve y Diaz* decision, the Supreme Court noted that the original suit in 1889 to foreclose a sugar plantation held by Mr. Sanchez in favor of Ms. Diaz "was the beginning of litigation in the Spanish courts which is said to have been the most protracted and bitter in the history of the island of P[ue]rto Rico." *Veve y Diaz,* 226 U.S. at 236.

Property No. 270, because it had previously been listed in the property registry as 300.5 cuerdas, but the Gómez survey determined it was 344.5 cuerdas.  DX 28T at 6-8.

In addition, any ambiguity in the nature of property transferred via a deed is to be reconciled in accordance with the intent of the grantor, or the legator in the case of property transferred in accordance with a will.  *See Bird Arias v. Societe Anonyme Des Sucreries de Saint Jean*, 62 F.2d 410, 412-13 (1st Cir. 1932) (finding that an "inadvertent" omission in a deed of a small share of a Puerto Rican farm did not destroy the grantees' title to the entire farm when the grantors' intent was to transfer the entire farm); *cf.* Restatement (Third) of Property § 11.3(c) (2003) ("The foundational constructional preference is for the construction that is more in accord with common intention," including "the construction that is more in accord with the donor's general dispositive plan than other plausible constructions.").  The deed through which Parcel 4 was created states that the real property assets of Pilar Gonzalez were inventoried for the purpose of dividing those assets among his heirs.  DX 28T at 6-7.  Therefore, the court must presume that the deed transferring those real property assets effected the transfer of *all* those assets, even if the accompanying survey appears to have incorrectly omitted part of the property.  *Accord Bird Arias*, 62 F.2d at 413.  The description of Parcel 4 in the deed and in the property registry indicates that it is bounded on the east by the ocean.  DX 28T at 9-10; PX 416T at 4.  This would include the peninsula that, as discussed *supra*, would have been part of Property No. 270.

In sum, the depiction of Property No. 270 in the Gómez survey was erroneous because, based on the chain of title in the Puerto Rican Property Registry, it should have included the peninsula to the east of what is now Parcel 4.  Similarly, the recorded size of Parcel 4 (67.5 cuerdas), based on the Gómez survey, was also erroneous because it did not account for the size of the peninsula.[20]  Accordingly, plaintiffs' title to Parcel 4 includes title to the peninsula, subject to the maritime terrestrial zone and rescue easement that all parties concede are controlled by the government.

  2.  *The 2.25-acre former gun mount site.*

The deed transferring the 2.25-acre tract to the Navy, which was signed by a notary and filed in the property registry, indicates that the tract was bounded on the north by the property of Antonio Lugo.  PX 12T at 4-5.  This description indicates that the tract is located at the northeast corner of former Lot 25, which was also the northern boundary of Property No. 117, from which the tract was segregated.  Former Lot 25 (now Parcel 5) is located north of Parcel 4, *see* PX 2T, placing the 2.25-acre tract well outside of the plaintiffs' current property.  As discussed *supra*, under Puerto Rican law an "escritura pública" signed by a notary and filed with the Puerto Rican Registry of Property is presumed to be true, and the party contesting its contents has the burden of proof.  P.R. Laws Ann. tit. 4, § 2002; *id.* tit. 31 § 3273.

The government nonetheless asserts that the description of the 2.25-acre tract's location in the deed is erroneous because the tract should be located at the northeast corner of former Lot 24 (now Parcel 4), and not Lot 25.  *E.g.*, Def.'s Post-Trial Br. at 86.  As evidence of this placement, the government points to the agreement of sale ostensibly signed by Mr. Mulero and

_____

[20]Even if the court were to have made a contrary finding, with the potential result that the Katzins never acquired an interest in the peninsula along with the rest of Parcel 4, the peninsula would be held by Ms. Winters as heiress to Pilar Gonzalez's estate.

Mr. Chadwick, the Navy's representative, the day after the deed was signed. *Id.* at 86-87.  This agreement fails as proof of the tract's location for several reasons.  First, the agreement of sale was neither notarized nor filed in the property registry, meaning that it does not receive the same protections or presumptions under Puerto Rican law as the recorded deed, which is presumed to be true and legal.  P.R. Laws Ann. tit. 30, § 2354.  In fact, Puerto Rican law specifies that "no contradictory action on the ownership of real properties or real rights recorded in the name of a specific titleholder may be taken without having previously . . . filed a suit in court for correction, annulment or cancellation of the corresponding registration, when it is in order." *Id.* Further, "[p]rivate instruments executed for the purpose of changing the agreements made in a public instrument shall produce no effect against a third person."  P.R. Laws Ann. tit. 31, § 3285. Accordingly, if, as the government contends, the parties' intent in signing the agreement of sale was to "clarify" that the 2.25-acre tract was located within former Lot 24, the proper procedure was for the government to file a suit for correction or annulment of the recorded deed.  Without such a suit, the subsequent agreement cannot serve in this action to nullify the deed's provisions, including its description of the property's location, particularly as applied against the plaintiffs in this case, who are "third parties" to whatever agreement existed between Mr. Mulero and the Navy.

Second, the language of the agreement of sale is executory, *i.e.*, taking effect at a future time, since it states that Mr. Mulero "*agrees* to sell, grant, transfer and convey" the tract to the Navy.  DX 42 at 1 (emphasis added).  Contrastingly, the language of the deed has immediately operative effect, stating that Mr. Mulero and the Guadalupes "*convey* their respective ownership [rights]" to the Navy.  PX 12T at 8 (emphasis added).  In light of this language, the agreement of sale can be viewed, at most, as an agreement between the parties to sell the property in question at some point in the future, which is peculiar given that the agreement of sale is dated one day *after* the deed was signed.  *Compare* DX 42 at 1 (dated June 29, 1903), *with* PX 12T at 1 (dated June 28, 1903).  Under Puerto Rican law, "[a]n instrument acknowledging an agreement or contract proves nothing against the instrument containing the same if by excess or omission they disagree therewith, unless the novation of the former is expressly proven."  P.R. Laws Ann. tit. 31, § 3279.  Accordingly, since the agreement of sale's description of the 2.25-acre tract's location differs from that contained in the recorded deed, the agreement cannot serve as proof of the deed's contents or intended effect.

Third, there is insufficient evidence that Escolástico Mulero signed or intended to be bound by the provisions of the agreement of sale.  The *deed* specifically states that Mr. Mulero could not read Spanish, let alone English.  PX 12T at 11.  And, his wife had a "sight impairment" and could not read as consequence of that impairment.  *Id.*  As a result, he and his wife requested that Ricardo Amado read and verify the contents of the deed on their behalf.  *Id.* at 11-12. Additionally, the notary read the deed "out loud, in a clear voice and in one single act, this being verified by the interpreter Mr. Manuel V. del Valle, who translated it into the English language, to all of which the representative of the purchaser, through the interpreter, expressed to be in agreement." *Id.*  The agreement of sale, however, is written entirely in English.  DX 42.  It does not indicate whether anyone translated or verified the agreement's contents for Mr. Mulero.  In addition, Mr. Mulero's name is written in script in the signature block of the agreement, under the word "His" and above the word "Mark," with what appears to be a cross or plus sign between the words "Escolastico" and "Mulero."  The government notes that a mark of "X" is commonly understood to "serv[e] as the signature of a person who is . . . illiterate," Def.'s Post-Trial Br. at 87 (quoting *X*, *Black's Law Dictionary* 1851 (10th ed. 2014)), but that is an improper description

of the "signature" on the agreement of sale.  In short, the validity of the agreement of sale is suspect in light of the provisions memorialized in the deed that ensured Mr. Mulero's understanding and agreement.

Finally, the government relies on the fact that in subsequent naval records, "the Navy repeatedly and consistently placed the 2.25-acre gun mount site on th[e] peninsula" to the east of Parcel 4.  Def.'s Post-Trial Br. at 88.  These documents, however, are not proof of the tract's location, nor are they proof of government title to the property depicted in those records.  At most, these records demonstrate that Navy personnel, and later FWS personnel, *thought* the 2.25-acre tract was located on or near the peninsula.[21]  The situation would be different if the gun mount had actually been constructed, as others were on Culebra, because construction and occupation would have constituted adverse possession.  But, no physical indicia exist of construction or occupation of this particular gun mount.  Overall, the government's claim to ownership of part of Parcel 4 as a site for a gun mount must fail.

## B.  *The Government's Actions with Respect to Parcel 4*

### 1.  *The government's actions.*

"A physical taking occurs when [the] 'government encroaches upon or occupies private land for its own proposed use.'"  *Love Terminal Partners v. United States*, 97 Fed. Cl. 355, 373 (2011) (quoting *Palazzolo v. Rhode Island*, 533 U.S. 606, 617 (2001)).  A physical taking can include either actual invasion of a landowner's property by the government or "appropriation of private property" for the government's benefit.  *Huntleigh*, 525 F.3d at 1378; *Ridge Line*, 346 F.3d at 1356.  In the case of a non-possessory taking, governmental action can effect a taking when it prohibits or prevents a landowner from exercising his or her property rights because of a governmental claim of ownership of those rights.  *E.g.*, *Yuba Goldfields*, 723 F.2d at 887-88 (reversing a grant of summary judgment for the government, and concluding that the government could have effected a "non-possessional taking" of plaintiff's mineral rights when it prevented plaintiff from extracting precious metals from a property because the government asserted it held those mineral rights); *see also id.* at 891 (finding that the government can effect a physical taking of property rights through the acts and statements of its officials, regardless of whether those acts were authorized by Congress); *Yaist v. Unite States*, 656 F.2d 616, 621 (Ct. Cl. 1981) ("[A] cause of action arises for the plaintiff under the Fifth Amendment through his allegation that he, and not the [g]overnment, holds the valid title."); *Bourgeois v. United States*, 545 F.2d 727, 729 n.1 (Ct. Cl. 1976) (holding that a plaintiff could appropriately try title in a just compensation suit because the Quiet Title Act of 1972, codified at 28 U.S.C. §§ 1346(f), 1402(d) and 2409a(a), specifically excepted actions that could be brought under the Tucker Act) (citing *Malone v. Bowdoin*, 369 U.S. 643, 647 n.8 (1962), while noting that *Malone* predated the Quiet Title Act by ten years, and *Carlson v. United States*, 208 Ct. Cl. 1022, 1023 (1976), commenting that *Carlson* established the vitality of *Malone* in a post-1972 setting); *cf. Del-Rio Drilling Programs, Inc. v. United States*, 146 F.3d 1358, 1365 (Fed. Cir. 1998) ("[I]t is frequently the case that the

---

[21]Some of these records acknowledged that the boundaries of federal property on Culebra were either poorly defined or in dispute with the owners of contiguous properties.  *See e.g.*, DX 6 at 313 n.2 (noting that the depictions of properties in the Navy real estate manual were "necessarily tentative" because of ambiguous or missing records); DX 1 at 25 (noting that because of ongoing property disputes, the quantity of federal land on Culabra was "uncertain").

takings claim will arise from action by a federal agency that is based on the agency's view that the private party does not enjoy the particular property right it claims."). The alleged taking in this case comports with the type of non-possessory physical taking found in *Yuba Goldfields* and *Bourgeois*. Here, the government has not physically occupied plaintiffs' property, other than to post FWS refuge signs along the coastal zone. Rather, the government has made a claim of ownership to part of plaintiff's property, and it has communicated that claim to prospective purchasers of plaintiffs' land, which actions plaintiffs claim have prevented them from exercising their right to sell Parcel 4. Accordingly, plaintiffs have claimed a physical taking of their property rights.

Analysis of a physical taking, as contrasted to a regulatory taking, generally "involves the straightforward application of *per se* rules." *Love Terminal*, 97 Fed. Cl. at 372 (quoting *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 322 (2002) (in turn quoting *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978))). In other words, once a physical taking has been established, the government must compensate the property owner "to the extent of the occupation, without regard to whether the action achieves an important public benefit or has only a minimal economic impact on the owner." *Id.* at 374 (quoting *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 434-35 (1982)).

An additional consideration with regard to the nature of the government's action is whether the alleged taking was permanent or temporary. *Yuba Natural Res., Inc. v. United States*, 821 F.2d 638, 641 (Fed. Cir. 1987) (examining whether the taking previously established in *Yuba Goldfields* was permanent or temporary for the purpose of determining just compensation). A "permanent" taking of a landowner's property rights "does not necessarily mean forever, or anything like it." *Otay Mesa Prop., L.P. v. United States*, 670 F.3d 1358, 1367 (Fed. Cir. 2012) (quoting *Hendler v. United States*, 952 F.2d 1364, 1376 (Fed. Cir. 1991)). Rather, the court must consider whether the government *intended* for the appropriation of a landowner's property rights to be perpetual, absent court intervention, including whether the appropriation had ended by or at the time of the court's decision. *Otay Mesa*, 670 F.3d at 1365-67 (citing *Speir v. United States*, 485 F.2d 643, 648 (Ct. Cl. 1973) (finding that a government-imposed easement was a temporary taking because the government stated at the outset that the easement would be temporary, and because the easement had ended at the time of the court's decision)). To the same effect as *Speir* is *Arkansas Game & Fish*, where the Supreme Court upheld a finding of a temporary taking attributable to flowage during the growing season, which had ceased at the time of trial. *See* __ U.S. at __, 133 S. Ct. at 518-21. A taking can also be permanent regardless of whether one of the parties has the ability readily to terminate the appropriation. *See Otay Mesa*, 670 F.3d at 1367-68 (citing *Loretto*, 458 U.S. at 438-41 (finding that the installation of a cable on the landowner's roof was a permanent taking, even though the landowner could theoretically have avoided this requirement by ceasing to rent the building to residential tenants)).

Here, plaintiffs assert that the government's interference with their ability to sell Parcel 4 has been continuous since June 2006. *E.g.*, Pls.' Post-Trial Br. at 24 (claiming that "[t]he [g]overnment's erroneous claims that it owned a portion of Lot 4 have made the property unsalable . . . requiring that [the plaintiffs] leave it economically idle"). There is no indication from the record of trial that, absent court intervention, the government intends to renounce its claim of ownership to a part of plaintiffs' property, or that it has done so at the time of this

writing.  Consequently, the court is constrained to find that the taking was permanent in nature, not temporary.

The alleged governmental actions in this case focus on the 10.01-acre peninsula to the east of Parcel 4.  The government does not claim any part of Parcel 4 beyond the peninsula, nor does the record show that any efforts to sell Parcel 4 after 2006 were impaired by government claims to property other than the peninsula.  At the same time, the extent of the government's claim *within* the peninsula has been inconsistent.  For example, Mr. Beasley's facsimile to Ms. Motta on June 22, 2006 contained a graphic depicting a small area within the peninsula (tract 1f, described as "an old gun mount site") and a strip along the coast (tract 1e), plus two additional graphics depicting a government claim to the entire 10.01-acre peninsula.  PX 288 at 4, 6-7.  Similarly, Ms. Rice's notes from 1994 reflected a property dispute with the Katzins over two distinct areas: a 10-acre area, which she understood to be the entire peninsula, and a 2.2-acre area that she understood to be a gun mount site.  DX 48 at 2; Tr. 1318:18-25 (Rice).  These same two disputed areas are mentioned in the 1994 FWS Annual Narrative Report for the Culebra Wildlife Refuge.  DX 49 at 62.  Even the government's position during the pendency of this case has been inconsistent, its having argued in its initial motion to dismiss that the United States has claimed ownership of the *peninsula* since the 1950s, *see* Def.'s Mot. to Dismiss or, in the Alternative, for Summary Judgment at 10-14, ECF No. 48, but focusing in its post-trial brief on a claim to the gun mount site *on the peninsula*, *see* Def.'s Post-Trial Br. at 6-10, while not disavowing a claim to the peninsula, *see id.* at 8.  Because of this inconsistency, the court must accept – as the plaintiffs and any prudent buyer would have to do – that the relevant governmental action is a claim of ownership, and thereby a permanent taking, of the entire 10.01-acre peninsula.

2. *Whether the government's actions appropriated plaintiffs' property rights.*

After the nature of the alleged government action has been determined, the further question for the court becomes whether that action did in fact appropriate plaintiffs' property rights.  The government's claim of ownership of part of the peninsula Parcel 4 adversely affected plaintiffs' ability to sell the property because they could not offer unfettered title to potential buyers.  And, the "ability to sell, assign, transfer, or exclude" is a "property right" within the meaning of the Fifth Amendment.  *See Hearts Bluff Game Ranch, Inc. v. United States*, 669 F.3d 1326, 1330 (Fed. Cir. 2012).  The degree of impairment is at issue.

The government claims that no appropriation of plaintiffs' property exists because plaintiffs "failed to show that the United States' actions actually led Mr. Klaber or any other buyer to decide not to buy their property."  Def.'s Post-Trial Br. at 88.  As evidence of this, the government points to the fact that Mr. Klaber had apparently indicated his desire to avoid purchasing the subject property as early as June 5, 2006, weeks before Mr. Beasley sent his facsimile claiming government ownership of part of the property.  *Id.* at 91.  The inferences necessary for this contention, however, are not supported.   Mr. Klaber was still looking for means to complete the purchase on June 15, 2006, PX 445, a week before Mr. Beasley's facsimile asserting government ownership.  And, evidence in the record shows that after Mr. Beasley sent the facsimile of June 22, 2006, the plaintiffs lost a prospective buyer in Mr. Klaber, and have since been unable to sell the land.  Tr. 437:11-25 (Wagner).  That evidence of unsalability has not been contravened by the government.

The operative fact is that any sale of the property to Mr. Klaber, or any other purchaser for that matter, after Mr. Beasley's communication on June 22, 2006 would have had to be subject to the government's ownership claims. The circumstances surrounding subsequent negotiations with potential purchasers show as much. For example, although Dr. Orbay testified that the government's ownership claim was not a factor in his decision not to purchase Parcel 4, Tr. 332:15-18 (Orbay), his e-mail communications with Ms. Wagner indicate otherwise, *e.g.*, PX 473 at 1 (stating that an FWS reserve on the property "has ominous implications for any future development"). As a consequence, the plaintiffs realistically were forced into negotiations with FWS over exchange of other property in an effort to release the government's claim on the 2.25-acre gun mount site, and the peninsula more generally, in an ultimately unsuccessful attempt to convince Dr. Orbay to complete the purchase. PX 492. The proposed purchase of Parcel 4 by GEM similarly accounted for "the contingent claim of [FWS] on yet to be determined coordinates regarding the ownership of 2.25 acres of land." PX 306.

The only other proposed purchaser was Mr. Colón, and although he stated to Ms. Wagner that he was not concerned about FWS's claim to 2.25 acres, Tr. 556:10 to 557:15 (Wagner), his proposal differed in significant respects from those made by the other proposed purchasers of Parcel 4. Mr. Colón evidently did not plan to develop the property but rather was primarily interested in "protect[ing] the view and privacy of his home," which is located just to the north of plaintiffs' property. DX 356 at 2. In addition, his offer was to purchase only 30 cuerdas of the property for $1.5 million, PX 498, which was less than half of plaintiffs' parcel, and the seaward half at that. In fact, plaintiffs had included Mr. Colón as a potential buyer in the listing agreement with Ms. Wagner, which suggests they had already considered selling a segment of the property to him and found his offer to be unsatisfactory. DX 72. Accordingly, the government cannot persuasively assert that the later offer from Mr. Colón is proof that the government's claim of ownership did not affect plaintiffs' ability to sell Parcel 4.

In sum, the government's claim of ownership of part of Parcel 4 appropriated plaintiffs' property rights such that they were not able to sell the parcel free of the government's claims. Plaintiffs are due compensation for a physical taking of the 10.01-acre peninsula claimed by the government.

C.   *Measurement of Just Compensation for Plaintiffs*

1.   *Value of the 10.01-acre peninsula taken by the government.*

When the government is found liable for a physical taking, the court must determine the amount of "just compensation" based on "precisely what the government takes from a landowner." *Otay Mesa*, 670 F.3d at 1368 (citing *United States v. General Motors Corp.*, 323 U.S. 373, 382 (1945)). The "computation of the compensation due" involves "an approach which seeks with the aid of all relevant data to find an amount representing value to any normally situated owner or purchaser of the interests taken." *Kimball Laundry Co. v. United States*, 338 U.S. 1, 20 (1949). "The landowner is entitled 'to be put in as good a position pecuniarily as if his proprerty had not been taken. He must be made whole but is not entitled to more.'" *Otay Mesa*, 670 F.3d at 1368 (quoting *Olson v. United States*, 292 U.S. 246, 255 (1934)).

Here, plaintiffs assert that "just compensation" for the government's taking is equivalent to the full fair market value of Parcel 4 in June 2006, calculated based on comparable sales on

Culebra and the nearby island of Vieques.  Pls.' Post-Trial Br. at 28-30.  Plaintiffs calculate the fair market value of Parcel 4 as $6,450,000, or $91,000 per cuerda, based on the expert report of their appraiser, Iván Canino, who determined that the "highest and best use" of the property was "subdivision in[to] residential parcels of five cuerdas."  *Id.* at 30-32 (citing PX 419 at 21 (Summary Appraisal Report as of June 22, 2006)); *see also id.* at 44 (noting that the "unit rate" for the property is $91,000 per cuerda).

The government contrastingly asserts that, at most, it should only be required to compensate plaintiffs for the "10.31 cuerdas (10.01 acres) shown on the 1947 Navy map." Def.'s Post-Trial Br. at 99.  The government's appraiser, Jośe Dapena, concurred that the highest and best use of the property was subdivision and sale as five-cuerda lots, and also used comparable sales on Culebra and Vieques to determine the property's value as of June 2006.  *Id.* at 102-05.  However, Mr. Dapena concluded that the property was worth only $36,000 per cuerda, or $376,000 for the 10.31-cuerda peninsula.  *Id.* at 100.

Both parties have raised valid concerns regarding the methodologies used by the two appraisers.  For example, the government asserts that Mr. Canino overvalued plaintiffs' property because certain adjustments he made to the sale prices of comparable properties were arbitrary, unsupported, or based on mathematical error.  Def.'s Post-Trial Br. at 109-13 (citing PX 419 at 34-35).  The government also asserts that three of the six properties identified by Mr. Canino as "comparable sales" were in fact not comparable because they were sales of smaller adjacent properties grouped together to appear like a larger property similar to Parcel 4, or they were properties that fronted a sandy beach, unlike Parcel 4 which is bordered by mangroves at its ocean frontage.  *Id.* at 113-16.  Conversely, plaintiffs claim that Mr. Dapena undervalued Parcel 4 because, using his proposed per cuerda value of $36,000, the overall value of the property ($2,430,000) would be far less than the $4 million purchase price negotiated with Mr. Klaber in 2006.  Pls.' Post-Trial Reply Br. at 10, ECF No. 134.  Plaintiffs also note that Mr. Dapena failed to adjust the prices of comparable sales based on significant features applicable to Parcel 4, such as "waterfront access" and being located on the windward side of the island, where there are fewer airborne insects such as mosquitos.  *Id.*

Although both appraisal reports provide context for the value of Parcel 4, the court finds that the best indicator of the property's fair market value as of June 2006 was the contract with Mr. Klaber for $4 million.  *See Foreign Trade Mgmt. Co. v. United States*, 110 Ct. Cl. 23, 31-32 (1947) (stating that just compensation could be the price at which plaintiff had contracted to sell the property at issue (copra), but not adopting that price because, for war-time reasons apart from the taking, plaintiff could not have consummated the contract).  Using this negotiated purchase price for a 67.5-cuerda property, the court determines a per-cuerda value of $59,259.26.  This per-cuerda value is further supported by the fact that it is close to the mean value ($63,500) between the plaintiffs' per-cuerda estimate of $91,000 and the government's per-cuerda estimate of $36,000.  Accordingly, the court finds that the appropriate compensation for the government's taking of the 10.01-acre (10.31-cuerda) peninsula is $610,962.97.  The court recognizes that the peninsula is a valuable segment of plaintiffs' property because it is bordered on three sides by the ocean, contains a substantial hill with stunningly beautiful views of the rest of the island, the ocean, and other nearby islands, and consists of enough land that it could be segregated into two separate developable parcels.  Even so, these desirable aspects of the peninsula as a property only confirm the valuation determination set out above.

2.  *Interest.*

To make the landowner "whole," the government may be required to not only compensate him or her for the direct value of the property taken, but also pay interest for the time between the taking and the date compensation is paid.  *Kirby Forest Indus., Inc. v. United States*, 467 U.S. 1, 10 (1984).  Plaintiffs also assert that they are entitled to compound interest from the date of the taking, June 28, 2006, based on the annual return of the Moody's Long-Term Aaa Corporate Bond Index ("Moody's Aaa Index").  Pls.' Post-Trial Br. at 44-45 (citing *Sears v. United States*, 124 Fed. Cl. 730, 736-37) (2016)).  In adjudicating the appropriate interest rate, the court follows the "prudent investor rule," which seeks to determine "how 'a reasonably prudent person' would have invested the funds to produce a reasonable return while maintaining safety of principal.'"  *Tulare Lake Basin Water Storage Dist. v. United States*, 61 Fed Cl. 624, 627 (2004) (quoting *United States v. 429.59 Acres of Land*, 612 F.2d 459, 464-65 (9th Cir. 1980)), *mot. for recons. granted in part and denied in part on other grounds*, 62 Fed. Cl. 684 (2004), *rev'd and remanded on other grounds*, 449 F.3d 1235 (Fed. Cir. 2006), *clarified on reh'g*, 465 F.3d 1308 (Fed. Cir. 2006).  For the reasons outlined in *Sears*, including the fact that other applicable rates such as the United States Treasury's Separate Trading of Registered Interest and Principal of Securities ("STRIPS") five-year and ten-year instruments "have been kept artificially low since the financial crisis of 2008," *Sears*, 124 Fed. Cl. at 735, the court concurs that the Moody's Aaa Index, compounded quarterly, is a rate that a prudent investor would objectively select in the market conditions prevailing during the relevant time.  Thus, it is the rate most appropriate for setting the interest component of the just compensation due to plaintiffs.

## CONCLUSION

For the reasons stated, the court finds that the plaintiffs have suffered a permanent physical taking of their property interests for which just compensation is due. The court awards the plaintiffs $610,962.97, measured by the size of the property taken (10.31 cuerdas or 10.01 acres) multiplied by a per-cuerda property value of $59,259.26.  The court also awards interest on that amount at the rate of return reflected by the Moody's Long-Term Aaa Corporate Bond Index, compounded quarterly, from June 22, 2006 to the date the judgment is actually paid.

Final judgment to this effect shall be issued under RCFC 54(b) because there is no just reason for delay. The clerk shall enter final judgment as specified.

In due course, plaintiffs may apply for an award of attorneys' fees and expenses under Section 304(c) of the Uniform Relocation Assistance Act, 42 U.S.C. § 4654(c).  Proceedings related to any such request for attorneys' fees and costs shall be deferred until after any appellate process has been concluded or, alternatively, after the time for taking an appeal has expired.

It is so ORDERED.

s/ Charles F. Lettow
Charles F. Lettow
Judge